James P. HASSETT, as Trustee of the Liquidating Estate of Continental Information Systems Corporation, et al., Judgment Creditor,

v.

Harry E. GOETZMANN, Jr., Judgment Debtor.

James P. HASSETT, as Trustee of the Liquidating Estate of Continental Information Systems Corporation, et al., Petitioner,

v.

Sylvia R. GOETZMANN and Eric Goetzmann, Respondents.

No. Misc. 3368(NPM).

United States District Court, N.D. New York.

June 19, 1998.

**184**

Hancock & Estabrook, LLP, Syracuse, New York, for Judgment Creditor and Petitioner; Stephen A. Donato, Daniel B. Berman, Eric C. Nordby, of counsel.

Poushter, Marshall & Leberman, P.C., Syracuse, New York, for Judgment Debtor and Respondents; William J. Leberman, of counsel.

## MEMORANDUM–DECISION & ORDER

McCURN, Senior District Judge.

In this bench trial, the court is called upon to determine whether Harry E. Goetzmann, Jr. (the "Judgment Debtor") made transfers of property with the actual intent to hinder, delay, or defraud his creditors. In addition, the court must determine whether the Judgment Debtor's wife Sylvia Goetzmann ("S.Goetzmann") and son Eric Goetzmann

("E.Goetzmann") (collectively "Respondents") received the Judgment Debtor's property with the actual intent to hinder, delay, or defraud the Judgment Debtor's creditors.

This action was commenced pursuant to Rule 69(a) of the Federal Rules of Civil Procedure and Article 52 of the New York Civil Practice Law and Rules. In this action, the Trustee invokes New York's Uniform Fraudulent Conveyance Act to set aside numerous alleged fraudulent transfers totaling more than $5.5 million made by the Judgment Debtor to S. Goetzmann and E. Goetzmann. Essentially, the Trustee sets forth three causes of action in an effort to set aside the conveyances and reach the Judgment Debtor's assets: (1) New York Debtor and Creditor Law ("DCL")[1] § 273 on the basis that the transfers rendered the Judgment Debtor insolvent and that these transfers lacked fair consideration; (2) DCL § 273–a on the basis that the Judgment Debtor made these transfers while an action was pending against him, and (3) DCL § 276 on the basis that the Judgment Debtor made these transfers with the actual intent to hinder, defraud, or delay his creditors. In addition, the Trustee sets forth a cause of action pursuant to § 276–a seeking an award of attorneys' fees. Subsequent to filing the petition, the Trustee moved for summary judgment on all the causes of action asserted in his petition. On January 26, 1998, the court granted summary judgment to the Trustee on his causes of action pursuant to DCL §§ 273 and 273–a, setting aside nearly all of the conveyances made to S. Goetzmann and E. Goetzmann as constructively fraudulent. *See Hassett v. Goetzmann*, 217 B.R. 9, 20 (N.D.N.Y.1998).[2] In addition, pursuant to DCL § 278, the court awarded the Trustee judgments against S. Goetzmann in the amount of $416,491 and against E. Goetzmann in the amount of $126,500, in the event the assets set aside were insufficient to satisfy the judgments. *See id.* at 21–22. The court denied the motion pursuant to DCL § 276 on the basis that the Judgement Debtor presented a question of

1. New York's adoption of the Uniform Fraudulent Conveyance Act is set forth in the New York Debtor and Creditor Law.

2. Familiarity with this prior decision is presumed for purposes of the instant decision.

fact with respect to whether he actually intended to hinder, delay, or defraud his creditors in connection with the asset transfers. *See id.* at 21. In addition, the court denied the Trustee's request for attorneys' fees at that stage in the litigation, primarily because they were predicated on a finding pursuant to DCL § 276 of actual intent by the Judgment Debtor to defraud his creditors. *See id.* at 22.

Subsequent to its decision, the court stayed enforcement of the judgments against S. Goetzmann and E. Goetzmann and set the remaining causes of action pursuant to DCL §§ 276 and 276–a down for trial which was held on June 1, 1998 through June 3, 1998. For the reasons that follow, the court finds that the Judgment Debtor, as well as S. Goetzmann and E. Goetzmann, acted with intent to hinder, delay, or defraud the Judgment Debtor's creditors in connection with the Judgment Debtor's fraudulent scheme to conceal his assets from his creditors.

## BACKGROUND

On January 13, 1989, Continental Information Systems Corporation ("CIS") filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York under Chapter 11 of the United States Bankruptcy Code. *See* Petition at ¶ 12. The Judgment Debtor founded CIS and prior to the appointment of the Trustee he was Chairman and Chief Executive Officer ("CEO") of CIS. *See id.* at ¶ 13.

On June 11, 1990, the Trustee commenced an adversary proceeding in the Bankruptcy Court against the Judgment Debtor seeking to recover $364,781 in bonuses paid to the Judgment Debtor by CIS, two weeks before CIS filed for Chapter 11 protection and at a time when CIS was insolvent. *See Hassett v. Goetzmann (In re CIS Corporation)*, 195 B.R. 251, 252 (Bankr.S.D.N.Y.1996). Ultimately, on April 15, 1996 the Bankruptcy Court issued its decision ordering that the Trustee may recover the entire $364,781 payment to the Judgment Debtor plus interest dating from March 22, 1990. On July 1, 1996, the Trustee registered this final judgment in this district pursuant to 28 U.S.C. § 1963. *See* Docket Document No. 23.

On April 29, 1991, the Trustee commenced another adversary proceeding against the Judgment Debtor in the Bankruptcy Court seeking recovery of $51,700 in allegedly improper fringe benefits that CIS paid to the Judgment Debtor. *See* Petition at ¶ 14. The Trustee moved for summary judgment and on November 18, 1993, the Bankruptcy Court issued an order directing the entry of a judgment against the Judgment Debtor for the sum of $51,700 plus pre- and post-judgment interest. *See Id.* at ¶ 15. On March 10, 1995, the Trustee registered this final judgment in this district pursuant to 28 U.S.C. § 1963. *See* Docket Document No. 1.

## FINDINGS OF FACT

The Judgment Debtor maintains that he lacks any assets and therefore cannot satisfy the judgments against him for essentially two reasons. First, the Judgment Debtor conveyed everything that he owned of value to family members around the time CIS was under financial distress. In March of 1989, after he received his bonuses and fringe benefits from CIS—and just two months after CIS filed for bankruptcy—the Judgment Debtor entered into an oral agreement with S. Goetzmann to transfer nearly all of his tangible assets to her. Subsequent to the oral agreement and at the request of S. Goetzmann, the Judgment Debtor drafted and executed a written acknowledgment of the oral agreement ("Assignment Agreement"). *See* Trustee's Exhibit ("Exh.") "1" (Assignment Agreement). Although this Assignment Agreement is dated "as of" March 15, 1989, the Judgment Debtor admits that the Assignment Agreement was actually prepared and executed sometime after that date.

The Judgment Debtor contends that the assets listed in the Assignment Agreement were transferred to S. Goetzmann in consideration for her pledging to Merchants National Bank and Trust Company of Syracuse ("MNB") her one-half interest in the marital residence and an adjacent parcel of undeveloped lakefront property held by the Goetzmanns in tenancy by the entirety. The total estimated value of the assets transferred to

S. Goetzmann exceeded $5 million,[3] while the value of the assets pledged by S. Goetzmann approximated $800,000.[4] *See* Trustee's Exhs. "1," "45" (financial statements). The Judgment Debtor testified that S. Goetzmann demanded that the assets be transferred to her and that the Judgment Debtor transferred them to her in large part because it "was the only fair thing to do."

In addition to the assets that were transferred to S. Goetzmann, the Judgment Debtor also transferred nearly $400,000 to E. Goetzmann. In November 1988, at a time when CIS was under financial distress, the Judgment Debtor delivered to E. Goetzmann $195,000 and requested that E. Goetzmann open a checking account at Citibank in E. Goetzmann's name and tax identification number. *See* Trustee's Exh. "7" (Citibank account statement). In the period between November 22, 1988 and December 19, 1988, the Judgment Debtor transferred $261,000 to E. Goetzmann for deposit in the Citibank account. *See* Trustee's Exh. "7." Significantly, the Judgment Debtor explained that the purpose of transferring this money to E. Goetzmann was to prevent MNB from exercising its right of offset in the event the Judgment Debtor defaulted on his loans from MNB.

At the time of the transfers, E. Goetzmann was 25 years old, held a bachelor's degree in business administration from Miami University in Oxford, Ohio, and was working at First Albany Corp. as a money manager. The Judgement Debtor testified that he did not tell his son why he wanted him to open the account and that his son did not inquire why his father wanted the account opened. E. Goetzmann testified that he was never told why his father wanted the account opened and that after he opened the account, he signed books of blank on his account and then delivered the signed blank checks to the Judgment Debtor. E. Goetzmann also testified that at the time he set up this account arrangement at Citibank he was unaware of his father's financial situation and unaware of his father's specific creditors although he "assumed" that his father owed money because "everyone has creditors." Notably, E. Goetzmann was aware that his father was the CEO of CIS and that he "may have read about claims of [his father's] creditors" in the local newspapers around the time he set up the account at Citibank, but that these newspaper articles did not "mean much" to him. The statements for his Citibank account were received at a post office box in Skaneateles, New York, where they were apparently picked up by the Judgment Debtor. *See* Trustee's Exh. "7." E. Goetzmann denied that the reason he set up this arrangement was so that the money appeared to be in his name, and not the Judgment Debtor's name. E. Goetzmann testified that he never intended to hinder, delay, or defraud any of his father's creditors.[5]

---

3. The value of the assets are approximated from the sworn financial statement the Judgment Debtor provided MNB in January 1989, less than two months before the alleged date of the Assignment Agreement. *See* Trustee's Exh. "45" (financial statement)

4. Among the assets conveyed to S. Goetzmann by the Judgment Debtor pursuant to the Assignment Agreement were: the Judgment Debtor's interest in his marital residence and 19.42 acres of adjacent land on Skaneateles Lake in Skaneateles, New York, valued at $1,800,000; the Judgment Debtor's interest in his camp located on Heron Lake in Upper St. Regis, New York valued at $400,000; the Schomann Entertainment Companies (which included Chesterfield Cablevision, Inc., Hamilton County Cable T.V., Inc., Area Telecable Corporation, Galeton TV Antenna, Inc., Mansfield Video Systems, Inc., and Communicable, Inc.) valued at $3,000,000; the Schomann Entertainment Corporation Note in the amount of $576,000; 547,547 shares of CIS common

stock valued at $342,217; the Judgment Debtor's interest in Onondaga Venture Capital Fund, Inc. valued at $35,000; the Hickey Properties' Note in the amount of $105,000; the Judgment Debtor's interest in Hickey Management, Inc. (value undetermined); the Judgment Debtor's interest in *Continental Realty Fund of New York, Inc.* valued at $12,500; the Judgment Debtor's interest in Sytel Ltd. Partnership valued at $550,000; the Judgment Debtor's interest in Ares–Serono Research; the Judgment Debtor's interest in his automobiles valued at $20,000; and antiques, boats, and jewelry valued at $200,000. *See* Trustee's Exh. "1" (Assignment Agreement).

5. In addition to maintaining this arrangement for his father, E. Goetzmann also maintained a similar arrangement for his mother, S. Goetzmann. *See* Trustee's Exh. "9" (Skaneateles Savings Bank account statements in name of E. Goetzmann). This arrangement with S. Goetzmann was handled in the same manner as the

In addition to transferring all of his assets, the second reason the Judgment Debtor lacks assets to satisfy the judgments against him is that he generates no income although he is employed and works between "35 and 125 hours a week." Currently, the Judgment Debtor is the president of Schomann International Corp. ("SIC"), a closely-held corporation that was incorporated by S. Goetzmann in June 1991. S. Goetzmann is also an officer of SIC and its majority shareholder. SIC was capitalized by S. Goetzmann using the proceeds from her sale of Schomann Entertainment Corporation and its subsidiaries—which sold for an amount in excess of $5 million.[6] *See* Trustee's Exh. "36" (stock purchase agreement); Exh. "37" (asset purchase agreement). The Judgment Debtor handles all of the finances for SIC and has check writing authority for SIC, which has a cash-on-hand position of more than S1 million. While SIC currently pays only the Judgment Debtor's expenses, the Judgment Debtor and S. Goetzmann hope to reap the benefits of their efforts in the future. The Judgment Debtor has no ownership interest in SIC, nor does he maintain a claim for deferred compensation.

## DISCUSSION

### I. *Jurisdiction.*

As a preliminary matter, the court observes that it maintains jurisdiction over this matter notwithstanding an appeal and cross-appeal taken by the parties from the court's January 26, 1998 decision.[7] Generally, the filing of a notice of appeal is a jurisdictional event inasmuch as it confers jurisdiction on the court of appeals and divests the district court of jurisdiction. *See Griggs v. Provident Consumer Discount Co.,* 459

U.S. 56, 58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982). However, an exception to this general rule exists where the notice of appeal is improperly filed because it confers upon the court of appeals "the power to do nothing but dismiss the appeal." *E.g., United States v. Rodgers,* 101 F.3d 247, 252 (2d Cir.1996).

In this case, the January 26, 1998 decision was non-final and there was no certification by the district court for an interlocutory appeal. Except in limited circumstances, appeals may only be taken from final decisions of the district courts. *See* 28 U.S.C. § 1291. Accordingly, the court maintains jurisdiction over this action because the parties' appeal was improper. *See United States v. Salerno,* 868 F.2d 524, 540 (2d Cir.1989) (frivolous appeal from district court order denying defendant's motion to dismiss does not displace district court's jurisdiction to proceed to trial); *see also Webb v. GAF Corp.,* 78 F.3d 53, 55 (2d Cir.1996) (district court is not divested of jurisdiction to grant a permanent injunction after an appeal from the district court's order granting a preliminary injunction).

### II. *Fraudulent Conveyance Pursuant to DCL § 276*

Section 276 provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

DCL § 276. Thus, in contrast to DCL § 273 which permits a finding of constructive fraud by circumstances such as the lack of fair consideration, § 276 requires "actual intent" to hinder, delay, or defraud creditors. *See*

---

arrangement with the Judgment Debtor. E. Goetzmann opened the account for S. Goetzmann then signed books of blank checks for her use. As the case with the Judgment Debtor, E. Goetzmann testified that he did not know why this arrangement was set up and that he never inquired why S. Goetzmann wanted such an arrangement. S. Goetzmann likewise testified that she could not recall why she had this banking arrangement with her son.

6. Schomann Entertainment Corporation and its subsidiaries was one of the assets that the Judgment Debtor transferred to S. Goetzmann pursu-

ant to the Assignment Agreement. *See* Trustee's Exh. "1."

7. On February 23, 1998, the Judgment Debtor and Respondents filed their notice of appeal with respect to the court's January 26, 1998 decision. Thereafter, on March 9, 1998, the Petitioner filed a notice of cross-appeal with respect to the decision. While the parties agree that the court maintains jurisdiction, the court must independently satisfy its obligation to ensure it possesses jurisdiction.

*United States v. McCombs,* 30 F.3d 310, 327 (2d Cir.1994). Under § 276, a conveyance will be set aside as fraudulent regardless of the adequacy of consideration given where the actual intent to defraud creditors is proven. *McCombs,* 30 F.3d at 328. Pursuant to this section, "[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud." *United States v. Carlin,* 948 F.Supp. 271, 277 (S.D.N.Y.1996); *Elgin Sweeper Co. v. Melson, Inc.,* 884 F.Supp. 641, 649 (N.D.N.Y.1995) (same).

The burden of proving "actual intent" is on the party seeking to set aside the conveyance. *E.g., McCombs,* 30 F.3d at 328; *Marine Midland Bank v. Murkoff,* 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dep't 1986). The actual intent to defraud must be proven by clear and convincing evidence. *See McCombs,* 30 F.3d at 328; *Murkoff,* 120 A.D.2d at 126, 508 N.Y.S.2d at 20. Actual intent is rarely, if ever, established by direct evidence. *See, e.g., In re Fill,* 82 B.R. 200, 220 (S.D.N.Y.1987). Rather, under § 276, the fraudulent nature of a conveyance may be inferred from the circumstances surrounding the transaction. *See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1041 (2d Cir.1984). The relevant circumstances, commonly referred to as the "badges of fraud," include, *inter alia:* transfers to relatives or close friends of the transferor; suspicious timing of the transfers or transfers that are unusual or hasty; lack of fair consideration for the transfers; whether the transfers rendered the transferor insolvent, and the transferor's retention of possession, benefit, or use of the property transferred. *See McCombs,* 30 F.3d at 328; *Murkoff,* 120 A.D.2d at 129, 508 N.Y.S.2d 17.

In this case, the court finds that the Trustee has met his burden to show by clear and convincing evidence that the Judgment Debtor acted with the requisite intent to delay, hinder, and defraud his creditors in connection with both the assets transferred to S. Goetzmann pursuant to the Assignment Agreement and the money transferred to E. Goetzmann. In addition, as discussed in section III, infra, the court finds that S. Goetzmann and E. Goetzmann had knowledge of the Judgment Debtor's intent at the time of the transfers and received the assets with the actual intent to hinder, delay, or defraud the Judgment Debtor's creditors.

With respect to the assets transferred to S. Goetzmann pursuant to the Assignment Agreement, the Judgment Debtor's proffered explanation for the transfers is unbelievable. Even assuming the Judgment Debtor found it necessary to convey assets to S. Goetzmann in consideration for her pledging her one-half interest in the marital estate and lakefront property, it unduly strains logic that the Judgment Debtor, given his business experience, believes that a transfer of over $5 million in assets is fair consideration for S. Goetzmann's pledge of approximately $800,-000 in assets. Equally illogical is the fact that the Judgment Debtor believed it necessary to convey all of his assets such that he was rendered insolvent.

Furthermore, with the Judgment Debtor's explanation unworthy of belief, the circumstances surrounding the transfers to S. Goetzmann lead to no other reasonable conclusion than the Judgment Debtor intended to hinder, delay, and defraud his creditors. As the Trustee pointed out, nearly all of the classic indicia of fraud are present here. For instance, the transaction involved an intrafamily transaction with the Judgment Debtor's wife. In addition, the timing of the transfers is highly suspect inasmuch as it was approximately two months after CIS filed for bankruptcy and at a time when the Judgment Debtor was aware of potential and actual problems with his creditors. The timing of the Assignment Agreement is even more suspect when it is viewed in connection with the timing of the transfer of the assets to E. Goetzmann. Moreover, the fact that the transfers rendered the Judgment Debtor insolvent and were made for grossly inadequate consideration undermines any legitimate argument that the Judgment Debtor did not intend to defraud his creditors. Finally, the Judgment Debtor's retention of the possession, benefit, and use of many assets he transferred to S. Goetzmann further illustrates the fraudulent intent of the Judgment Debtor. For instance, he continues to reside at the marital estate, continues to drive one

of the vehicles conveyed to S. Goetzmann, and, significantly, derives substantial benefit from the proceeds from the sale of the assets that were transferred to S. Goetzmann.

Independent of the fraudulent conveyances, the significance of the Judgment Debtor working "between 35–125 hours a week" for no compensation cannot be disregarded. Two conclusions can be readily drawn from this arrangement. One, the Judgment Debtor works for no compensation in furtherance of his scheme to defraud his creditors, *i.e.*, by receiving no compensation he generates no income which could be attached. Two, because the Judgment Debtor conceded that he and S. Goetzmann anticipate that they will someday reap the rewards of his efforts—despite that he has neither a claim for deferred compensation nor an ownership interest in SIC—he has tacitly conceded that he retains the control and benefit of SIC by operating it behind the shield of S. Goetzmann. These conclusions further illustrate the intentional fraud behind the Judgment Debtor's scheme.

In sum, the totality of the circumstances clearly and convincingly demonstrates that the Judgment Debtor intended to hinder, delay, and defraud his creditors. Accordingly, DCL § 276 provides a third independent and alternative basis to set aside the fraudulent transfers made to S. Goetzmann pursuant to the Assignment Agreement that were previously set aside as constructively fraudulent. *See Hassett,* 217 B.R. at 19–20 (finding assets transferred pursuant to the Assignment Agreement constructively fraudulent pursuant to DCL § 273 and alternatively, pursuant to DCL § 273–a).

With respect to the assets transferred to E. Goetzmann, the court finds that the Judgment Debtor's concession that he sought to avoid MNB's right of offset, coupled with his failure to convince the court that the arrangement served any legitimate purpose, leads to the conclusion that the Judgment Debtor acted with the intent to hinder, delay, and defraud his creditors in connection with this arrangement. While the Judgment Debtor justifies the transfers by contending that the MNB loans were sufficiently collateralized by other assets, this justification does not alter the fact that the Judgment Debtor intended to hinder MNB's right of offset. Significantly, when questioned by the Trustee, the Judgment Debtor conceded that the banking arrangement with E. Goetzmann would probably frustrate other creditors as well. It is plain that the Judgment Debtor was shielding his money from his creditors by transferring such assets to E. Goetzmann.

In addition to the Judgment Debtor's own admissions, the record also independently supports a finding of the Judgment Debtor's intent to defraud his creditors. More significant than the now familiar intrafamily transfers lacking consideration, the timing of the transfers is particularly suspect because the bank account at Citibank in E. Goetzmann's name was set up at a time when CIS was in financial distress and subsequent to CIS seeking the advice of bankruptcy counsel. Moreover, it is clear that the Judgment Debtor intended to hide the existence of this account by willfully failing to disclose it on sworn financial statements. *See* Trustee's Exhs. "27" and "45."

In sum, the court finds that the Judgment Debtor intended to deny, hinder, and defraud his creditors by transferring $393,500 in cash to E. Goetzmann. Accordingly, the court sets aside the entire $393,500 transferred to E. Goetzmann as fraudulent pursuant to DCL § 276. Furthermore, DCL § 276 provides a third alternative and independent basis for setting aside the $126,500 previously set aside as constructively fraudulent. *See Hassett,* 217 B.R. at 20 (setting aside $126,500 of the $393,500 transferred as constructively fraudulent pursuant to DCL § 273 and alternatively, DCL § 273–a).

### III. *Attorneys' Fees Pursuant to DCL § 276–a*

In addition to the Trustee's cause of action under DCL § 276, the Trustee has remaining a cause of action for his attorneys' fees. DCL § 276–a provides, in pertinent part, that attorneys' fees should be awarded when a conveyance "is found to have been made by the debtor and received by the transferee with actual intent, as distin-

guished from intent presumed in law, to hinder, delay or defraud either present or future creditors." DCL § 276–a. Thus, § 276–a provides for attorneys' fees in the event that a party proves that a transfer is made and received with actual intent. *Cf. Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991); *Murkoff*, 120 A.D.2d at 126, 508 N.Y.S.2d at 20–21. (2d Dep't1986).

As set forth fully in section II, *supra*, the Trustee has established by clear and convincing evidence that the Judgment Debtor acted with the intent to hinder, delay, and defraud his creditors in connection with the transfers to S. Goetzmann and E. Goetzmann. The court now finds that the Trustee has established by clear and convincing evidence that S. Goetzmann and E. Goetzmann knowingly participated in the scheme with the intent to hinder, delay, or defraud the Judgment Debtor's creditors. Accordingly, the Trustee is entitled to his attorneys' fees.

■■■ During her testimony, S. Goetzmann could not recall her intentions behind the financial dealings she had with the Judgment Debtor. This does not, however, preclude a finding of intent within the meaning of § 276–a on the part of S. Goetzmann because the record clearly reveals her knowledge and intent in connection with her dealings with the Judgment Debtor.

Particularly illustrative with regard to the intent and knowledge of S. Goetzmann is the evidence in the record regarding the sale of Schomann Entertainment Corporation by S. Goetzmann, after it was fraudulently transferred to her by the Judgment Debtor. Subsequent to the sale of Schomann Entertainment Corporation, S. Goetzmann transferred the proceeds into an account in the name of her brother, Mark J. Ingraham, an attorney in New Jersey. At trial, S. Goetzmann could not recall the reason she had the proceeds of the sale from the Schomann Entertainment Companies held in her brother's name. However, as the Trustee pointed out. S. Goetzmann did recall her intent during a pre-trial deposition in 1995. During that deposition, S. Goetzmann testified that Mark

Ingraham was holding the money because the Goetzmanns "have had trouble keeping bank accounts, being able to have bank accounts because of our financial problems" in that "they tend to seize your accounts." *See* Deposition Transcript of Sylvia R. Goetzmann, dated July 12, 1995, at 200–202. Thus, S. Goetzmann did, at one time, recall that her intent in placing the proceeds of the sale in Mark Ingraham's name was to hinder or delay creditors. S. Goetzmann's 1995 deposition testimony also reveals her probable intent in connection with maintaining a checking account in E. Goetzmann's name, although she was unable to recall at trial.

Regarding matters S. Goetzmann could recall, there were significant inconsistencies with her testimony that support the conclusion that she intended to delay or hinder the Judgment Debtor's creditors. With respect to the Assignment Agreement, S. Goetzmann testified that she required security in consideration for her pledge and accordingly received the assets enumerated in the Assignment Agreement.[8] However, in February 1993, when a foreclosure action was commenced by MNB in which S. Goetzmann was a defendant in connection with pledging her one-half interest in the marital residence, she submitted an affidavit to the New York Supreme Court, Appellate Division, which contradicts her testimony. *See* Trustee's Exh. "33." (affidavit). In that affidavit, S. Goetzmann averred that she "had no knowledge of the nature of the documents that I signed," referring to the note and mortgage executed by her in connection with pledging her interest to MNB and in an apparent attempt to stall foreclosure proceedings. *See id.* at ¶ 8. S. Goetzmann also averred that she "personally received no consideration in any form" for pledging her interest in the marital estate to MNB. *See id.* ¶¶ 7–8. These inconsistencies demonstrate S. Goetzmann's ability to conveniently alter sworn testimony depending upon the circumstances confronted. Viewing these inconsistencies in connection with S. Goetzmann's statement regarding her intent behind placing funds in Mark

---

8. Recall that the Judgment Debtor's collaborating testimony was that S. Goetzmann "demand-

ed" that she receive security for her pledge.

Ingraham's name, it is apparent that she intended to delay and hinder the Judgment Debtor's creditors in connection with her knowing participation in his fraudulent scheme.

With respect to E. Goetzmann, his testimony that he was unaware of the Judgment Debtor's intent when he set up his accounts is unbelievable. Despite E. Goetzmann's attempt to characterize himself as nothing more than an obedient son, it simply defies logic that an individual such as E. Goetzmann who holds a bachelor's degree in business administration and works as a money manager can steadfastly maintain that he had no conceivable idea why his father set up an account in his name and transferred nearly $400,000 into that account. Equally unbelievable was E. Goetzmann's claims that despite reading the news accounts of CIS's financial difficulties, they did not "mean much" to him, that he did not fully comprehend their significance, and that he did not believe they were connected to his father's transfer to him of approximately $400,000. Furthermore, E. Goetzmann advanced no legitimate purpose for the accounts. It is also significant that E. Goetzmann maintained a similar account arrangement with S. Goetzmann and also claimed ignorance with regard to her intent. Thus, given the circumstances and the timing of the events surrounding the transfers of the funds to him, as well as his implausible explanation that he was simply following instructions and was unaware of the Judgment Debtor's intentions, it is clear that E. Goetzmann received the transfers from the Judgment Debtor with the intent to hinder, delay, and defraud the Judgment Debtor's creditors.

Accordingly, the court finds that the Trustee has proven that the Judgment Debtor transferred the assets in question with the intent to defraud his creditors and S. Goetzmann and E. Goetzmann received the assets with the intent to delay, hinder, or defraud the Judgement Debtor's creditors. Thus, the Trustee is entitled to his attorneys' fees from the Judgment Debtor, S. Goetzmann, and E. Goetzmann.

## IV. *Relief Pursuant to DCL § 278*

Finally, the Trustee seeks relief pursuant DCL § 278 in connection with two matters. First, the Trustee seeks to modify the judgment this court entered against S. Goetzmann to reflect the fact that the judgments the Trustee obtained against the Judgment Debtor were awarded with pre- and post-judgment interest. The $364,791 judgment, awarded by the Bankruptcy Court on April 15, 1996, and entered on May 16, 1996, carries pre-judgment interest at the statutory rate set forth in 28 U.S.C. § 1961 dating from March 22, 1990, and post-judgment interest at the same rate. *See In re CIS Corp.,* 195 B.R. at 263. Similarly, the $51,700 judgment, awarded by the Bankruptcy Court on November 18, 1993 and entered on November 22, 1993, carries pre-judgment interest at the statutory rate set forth in 28 U.S.C. § 1961 from April 27, 1989, as well as post-judgment interest at the same rate. *See* Docket Document No. 1.

As the court set forth in January 26, 1998 decision, when "a conveyance is fraudulent under DCL § 273, the 'creditor may obtain judgment against any transferee to whom his debtor has transferred the property up to the value of the property.' " *United States v. Red Stripe, Inc.,* 792 F.Supp. 1338, 1344 (S.D.N.Y.1992) (quoting *De West Realty Corp. v. Internal Revenue Service,* 418 F.Supp. 1274, 1279 (S.D.N.Y.1976)). The judgment, however, is limited to the amount of the creditor's claim. *See De West Realty Corp.,* 418 F.Supp. at 1279. In its January 26, 1998 decision, this court held that the Trustee is entitled to judgment against S. Goetzmann and E. Goetzmann as Respondents in the amount of the judgments the Trustee has against the Judgment Debtor limited by the value of the property that was fraudulently conveyed. *See Hassett,* 217 B.R. at 22. Thus, the Trustee is entitled to judgment against S. Goetzmann and E. Goetzmann as transferees of the fraudulently conveyed assets up to the value of the Trustee's judgments, but limited to the value of the assets transferred. In the case of S. Goetzmann, the Trustee's judgment is limited only by the amount of the fraudulently transferred assets, approximately $5.5 million.

192

Accordingly, the Trustee is entitled to have his judgment against S. Goetzmann modified to reflect the present value of his judgments against the Judgment Debtor, which would include the interest due on the judgements. In the case of E. Goetzmann, the Trustee is limited to the total value of the assets transferred, or $393,500, which would include the assets transferred to E. Goetzmann after January 13, 1989 as determined by the court's January 26, 1998 decision as well as the assets that the court now finds were fraudulently transferred. Because the Trustee's judgments against the Judgment Debtor exceed the value of the assets transferred to E. Goetzmann, the Trustee's judgment is limited and cannot exceed the $393,500, exclusive of interest, of course.

■ The second matter in which the Trustee seeks relief pursuant to DCL § 278 is that he asserts he should be entitled to enforce his judgments against S. Goetzmann and E. Goetzmann without first seeking to satisfy such judgments from the property fraudulently conveyed to them by the Judgment Debtor. *See* Trustee's letter brief, dated June 5, 1998. The reason for the Trustee's request is that "the remaining assets found by the Court to have been conveyed by [the Judgment Debtor] to Mrs. Goetzmann are essentially without value" and "none of the monies transferred to Eric Goetzmann remain." *Id.*

The court is constrained to deny the Trustee's request. In awarding the judgments against the Respondents, the court ruled that "[t]he judgments against the transferees are enforceable to the extent the Trustee is unable to satisfy the Judgments with the assets set aside pursuant to DCL § 273." *Hassett,* 217 B.R. at 22. Thus, the Trustee may only enforce the Judgments against Respondents as the transferees to the extent that the Trustee cannot rely on the assets that have been set aside as fraudulent transfers.

■ The reasoning for the court imposing this limitation is well founded in the law governing fraudulent transfers in New York. It is long settled that "[t]he gravamen of an action [for fraudulent conveyance] is the right of the creditor to be paid out of assets to which he is actually entitled and to

set aside the indicia of ownership which apparently contradict that right." *Hearn 45 St. Corp. v. Jano,* 283 N.Y. 139, 142, 27 N.E.2d 814, 816–17 (1940) (citing DCL §§ 270–81). The purpose of an action under the DCL is to require the debtor to recover his fraudulently transferred property so that the property may be used to satisfy the debt owed to the creditor. *See id.; see also Federal Deposit Insurance Corp. v. Porco,* 75 N.Y.2d 840, 842, 552 N.Y.S.2d 910, 911, 552 N.E.2d 158 (1990) (New York's fraudulent conveyance law allows only for "nullification of the conveyance"); *Hearn 45 St. Corp. v. Jano,* 283 N.Y. at 142, 27 N.E.2d at 816 (essence of a fraudulent conveyance claim is that it allows a creditor to collect on his debt by "undo[ing] the transfer of title so as to bring within the ambit of execution those assets upon which the creditor is rightly entitled to levy").

■ While the DCL has been interpreted to provide that "a creditor may obtain judgment against any transferee to whom his debtor has transferred the property up to the value of the property," *see Red Stripe,* 792 F.Supp. at 1344 (citations omitted), this interpretation must be in accord with an entire reading of the statute. *Cf. Talbot Typographics, Inc., v. Tenba, Inc.* 560 N.Y.S.2d 82, 84, 147 Misc.2d 922, 924 (N.Y.City Civ. Ct.1990) ("A creditor's action to set aside transfers and follow assets of a ... debtor pursuant to ... the Debtor and Creditor Law ... has long been characterized as an action in equity in rescission." (citing *Hearn 45 St. Corp. v. Jano,* 238 N.Y. 139, 27 N.E.2d 814)). Judgments against transferees are generally limited to situations, such as those present in this case, where the transferees were aware of the transferor's fraudulent scheme and where the assets were disposed of or depreciated. *See Murkoff,* 120 A.D.2d 122, 132–33, 508 N.Y.S.2d 17, 24–25.

In the instant case, the Trustee primarily contends that because the Judgment Debtor's interest prior to the fraudulent transfers was that of tenant by the entirety with right of survivorship, his interest has insufficient value to justify levying upon and selling his

interest. *See* Trustee's letter brief at 1–2. As the Respondents point out, the court in *Murkoff* dealt with this very issue and declined to terminate the tenancy by the entirety and convert it to a tenancy in common because to do so would be contrary to the legislative intent of the DCL. *See Murkoff,* 120 A.D.2d 122, 131, 508 N.Y.S.2d 17, 23–24; *see also Orbach v. Pappa,* 482 F.Supp. 117, 120–121 (S.D.N.Y.1979) (court rejected trustee's claim that fraudulent transfer transformed a tenancy by the entirety into a tenancy in common and reiterated that the trustee is entitled to the relief as against the transferor's interest in the property held by the entirety).

▪ It would contravene the statute to allow the Trustee to seek to satisfy the judgments first by attacking assets of the Respondents without ensuring that the transferred assets were not available to satisfy the judgments. Indeed, it is well settled that an action for fraudulent conveyance in New York does not create an independent remedy of money damages against third parties who assist the debtor. *See Porco,* 75 N.Y.2d at 842, 552 N.Y.S.2d at 911, 552 N.E.2d 158; *Murkoff,* 120 A.D.2d at 133, 508 N.Y.S.2d at 25 (creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance; the limited remedies explicitly permitted under the statute confirm this interpretation). Thus, to allow the Trustee to satisfy the judgments through the personal assets of the Respondents without attempting to reclaim the fraudulently transferred assets would provide the Trustee with a remedy to which he is not entitled under New York law. *See Murkoff,* 120 A.D.2d at 133, 508 N.Y.S.2d at 25 ("the defrauded creditor is not entitled to an enhancement of position beyond what it was before the fraud").

Before concluding, the court must dispel the Trustee's suggestion that he is free to pursue each of the judgments against S. Goetzmann and E. Goetzmann independent of one another. As Respondents point out, the Trustee must in the first instance attempt to satisfy his judgments against the Judgment Debtor and first determine the extent to which those judgments can be satisfied from the transferred assets. *See* Respondents' letter brief, dated June 8, 1998. Only at that point can the Trustee pursue the judgments independently against the Respondents. This limitation, however, applies only to the enforcement of the judgments insofar as they stem from the Trustee's judgments against the Judgment Debtor and has no application to the judgments that will soon be awarded to the Trustee in connection with his attorneys' fees. The court finds no reason to place any limitation on the Trustee's enforcement of his judgments for attorneys' fees.

## CONCLUSION

For, the foregoing reasons, the court concludes that the Judgment Debtor transferred the assets in question to S. Goetzmann and E. Goetzmann with the intent to defraud his creditors within the meaning of DCL § 276.

The court also concludes that S. Goetzmann and E. Goetzmann had knowledge of the Judgment Debtor's fraudulent scheme and received the assets with the intent to hinder, delay, or defraud the Judgment Debtor's creditors within the meaning of DCL § 276–a.

Further, the court awards the Trustee his attorneys' fees in connection with this matter against the Judgment Debtor, S. Goetzmann, and E. Goetzmann in an amount to be determined. Upon determination of the amount of the attorneys' fees, the court will enter judgment against the respective parties in accordance herewith. The Trustee is directed to submit his fee request together with affidavits in support thereof by June 29, 1998. The Judgment Debtor, S. Goetzmann, and E. Goetzmann may submit any objections to the reasonableness of the Trustee's request by July 10, 1998.

IT IS SO ORDERED.