732 A.2d 482

LEA GILCHINSKY, PLAINTIFF–RESPONDENT, v. NATIONAL WESTMINSTER BANK N.J., THE ESTATE OF RICHARD RODGERS, THE ESTATE OF DOROTHY RODGERS, THE ESTATE OF OSCAR HAMMERSTEIN II, JACK TERHUNE, SHERIFF OF BERGEN COUNTY AND JOHN DOES 1–10 (WHOSE IDENTITIES ARE NOT YET KNOWN), DEFENDANTS, AND THE RODGERS AND HAMMERSTEIN ORGANIZATION, DEFENDANT–APPELLANT.

THE RODGERS AND HAMMERSTEIN ORGANIZATION, PLAINTIFF–APPELLANT, v. LEA GILCHINSKY, DEFENDANT–RESPONDENT.

Argued March 30, 1999—Decided June 14, 1999.

466

*Charles C. Abut* argued the cause for appellant.

*Merrill M. O'Brien* argued the cause for respondent (*Dollinger & Dollinger,* attorneys; *Howard B. Leopold,* of counsel and on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

*N.J.S.A.* 25:2–1 generally exempts property held in an individual retirement account ("IRA") from attachment by creditors. Although providing a safe harbor for retirement assets, *N.J.S.A.* 25:2–1(b)(1) specifically states that assets fraudulently conveyed in violation of the Uniform Fraudulent Transfer Act are not immune from attachment. The question raised in this appeal is whether defendant's transfer of funds from her New York pension plan, established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 *U.S.C.* §§ 1001 to–1461, into a New Jersey IRA constituted a fraudulent conveyance, thereby removing the funds from the exemption under *N.J.S.A.* 25:2–1(a).

I.

Lea Gilchinsky was employed as a bookkeeper by Rodgers and Hammerstein Organization ("R & H") from 1987 through 1991.[1] During that period, she embezzled over $700,000 from the company. In August 1991, Gilchinsky was indicted for second-degree

---

[1] Gilchinsky was employed by R & H in various positions from 1980 through 1991.

grand larceny [2] by a New York grand jury. In May 1992, she pled guilty to attempted second-degree grand larceny and was sentenced to one year in prison.

In July 1992, R & H filed a civil action against Gilchinsky in New York to recover $935,643, consisting of the amount embezzled plus the $204,474 R & H had paid Gilchinsky in salary and bonuses during the period of the theft. In January 1993, the New York Supreme Court issued a temporary restraining order prohibiting "any sale, assignment, transfer, or interference with any" interest of defendant in personal and/or real property located in the State of New York. On December 29, 1994, a final restraining order was issued prohibiting defendant from making "any sale, assignment or transfer of, interference with any property, in which you have an interest."

In February 1993, the New York Supreme Court awarded R & H a money judgment against defendant in the amount of $226,455.93, for partial damages suffered as a result of the embezzlement. A Special Master was appointed to determine the remainder of the award. The court also finalized the Order of Attachment, placing a lien on all of defendant's property located in the State of New York.

Throughout the next year and a half, R & H attempted to negotiate with defendant to resolve the lawsuit. Defendant's only admitted asset was $84,280.55, vested in R & H's ERISA Profit Sharing Plan. In June 1994, defendant requested that R & H roll that money over to an IRA account she had opened in the Fort Lee, New Jersey branch of National Westminster Bank ("Nat-West"). R & H did not comply immediately with her request. Instead, the company pursued settlement discussions with defendant regarding the ERISA funds throughout the summer and fall of 1994.

---

[2] Second-degree grand larceny is defined as stealing property in excess of $50,000. It is a class C felony. *N.Y. Penal Law* § 155.40(1) (McKinney 1990).

At a deposition in October 1994, defendant testified that she had one demand checking account in the Fort Lee branch of NatWest bank that she had opened in 1991. She stated that her brother deposited money into that account so she could pay her rent and credit card debts. She further testified that she had no individual retirement accounts and no personal property of substantial value. She admitted that she had closed out all of her New York bank accounts and withdrew all the money she had accrued in a New York IRA after the judgment had been entered against her. She claimed that she was currently insolvent, having spent all of her money in Atlantic City to fuel her gambling addiction. The R & H pension was the only money defendant allegedly had.

R & H continued to negotiate with defendant regarding the pension until November 1994, when the discussions fell through. In a letter to R & H's General Counsel, defendant demanded that her share of the Rodgers and Hammerstein Profit Sharing Plan be transferred immediately in one lump-sum payment into an IRA account opened in her name at NatWest Bank in Fort Lee, New Jersey. Under federal law, R & H had no choice but to comply with the request. 29 *U.S.C.* § 1056(d). On December 30, 1994, R & H transferred defendant's ERISA pension to the New Jersey IRA.

R & H immediately filed suit in New Jersey to domesticate the New York judgment and place a lien on the funds. On January 9, 1995, the Superior Court issued an Order to Show Cause. On January 10, 1995, the court issued a Writ of Attachment, placing a lien on all of defendant's personal property located in the State of New Jersey.

Defendant never answered the Order to Show Cause and did not oppose the order attaching her IRA. Instead, her attorney filed a separate lawsuit collaterally attacking the orders. Ruling that defendant's action was barred by the entire controversy doctrine, the court dismissed her claims. On February 2, 1995, the court entered an Order domesticating the foreign judgment and directing the turnover of all property levied upon by the

January 10 Writ of Attachment. · On April 4, 1995, NatWest delivered the funds contained in defendant's New Jersey IRA to R & H.

In June 1996, over sixteen months later, defendant moved for relief from the February 2, 1995 Order. Defendant contended that the funds in the IRA were immune from attachment under *N.J.S.A.* 25:2–1(a). The court granted defendant's motion for reconsideration, limited to the question of whether R & H's attachment of the funds in the New Jersey IRA violated *N.J.S.A.* 25:2–1.

Both parties agreed that the facts were not in dispute and the matter was ripe for summary judgment. After oral argument, the trial court concluded that given the timing of the transfer, the New York restraining order, defendant's lack of contacts with New Jersey, and the fact that she was otherwise insolvent, "[n]o rational fact finder ... objectively could come to any conclusion but that the purpose of this across the Hudson transfer was for no other purpose than to evade, thwart, [and] hinder creditors and to preclude, or at least make [collection] extremely difficult...." Accordingly, it held the money was not exempt from attachment under *N.J.S.A.* 25:2–1. *See N.J.S.A.* 25:2–1(b)(1).

The Appellate Division reversed, finding that the "motion judge considered only a few of the factors under *N.J.S.A.* 25:2–26 in reaching his decision[.]" *Gilchinsky v. Westminster Bank,* 311 *N.J.Super.* 339, 349, 709 *A.*2d 1347 (1998). Giving controlling weight to the absence of three factors enumerated in *N.J.S.A.* 25:2–26, the Appellate Division concluded that defendant did not have an actual intent to defraud her creditors. According to the panel, the "controlling factors" indicating the transfer was not a fraudulent conveyance were: "that the transfer was not concealed; the creditor, R & H, participated in the transfer; and the funds continued to be held in a trust account after the transfer." The panel reasoned that the funds were protected from attachment in both New York and New Jersey. Therefore, defendant gained no advantage by the transfer. The Appellate Division also did not

believe that the transfer violated any New York restraining order. Accordingly; it held that the money in the NatWest IRA was "entitled to the safe harbor protection the Legislature created for pension funds" and was immune from attachment under *N.J.S.A.* 25:2–1(a). *Gilchinsky, supra,* 311 *N.J.Super.* at 350, 709 *A.*2d 1347. We granted R & H's petition for certification, 156 *N.J.* 427, 719 *A.*2d 1025 (1998), and now reverse.

## II.

ERISA contains an anti-alienation provision prohibiting the assignment or garnishment of pension benefits. 29 *U.S.C.* § 1056(d)(1). Had defendant left her money in the R & H Profit Sharing Plan, there is no doubt that it would have been exempt from attachment. *Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 *U.S.* 365, 376, 110 *S.Ct.* 680, 687, 107 *L.Ed.*2d 782, 795 (1990) (refusing to carve out equitable exception to Section 1056(d) even where employee engaged in malfeasance and/or criminal misconduct), *appeal after remand,* 10 *F.*3d 700 (10th Cir.1993), *reh'g* 39 *F.*3d 1078 (10th Cir.1994), *cert. denied,* 514 *U.S.* 1063, 115 *S.Ct.* 1691, 131 *L.Ed.*2d 556 (1995); *see also State v. Pulasty,* 136 *N.J.* 356, 361, 642 *A.*2d 1392 (refusing to attach funds while in ERISA account but allowing attachment once funds in pensioner's possession), *cert. denied,* 513 *U.S.* 1017, 115 *S.Ct.* 579, 130 *L.Ed.*2d 494 (1994). Unlike ERISA, however, the tax code contains no anti-alienation provision. Nor does it address the validity of attachment of IRA funds. Therefore, that issue is governed by State law. *C.P. v. Township of Piscataway Bd. of Educ.,* 293 *N.J.Super.* 421, 437, 681 *A.*2d 105 (App.Div.1996); *Halliburton Co. v. Mor,* 231 *N.J.Super.* 197, 199, 555 *A.*2d 55 (Law Div.1988); *In re Yuhas,* 104 *F.*3d 612 (3d Cir.), *cert. denied, Orr v. Yuhas,* 521 *U.S.* 1105, 117 *S.Ct.* 2481, 138 *L.Ed.*2d 990 (1997). Accordingly, by transferring the money to a New Jersey IRA, the money lost the blanket protection afforded by ERISA and became subject to New Jersey law.

## A.

■ *N.J.S.A.* 25:2–1 governs the rights of creditors to attach funds in an IRA. *N.J.S.A.* 25:2–1 provides in part:

a. Except as provided in subsection b. of this section, every deed of gift and every conveyance, transfer and assignment of goods, chattels or things in action, made in trust for the use of the person making the same, shall be void as against creditors.

b. Notwithstanding the provisions of any other law to the contrary, any property held in a qualifying trust and any distributions from a qualifying trust, regardless of the distribution plan elected for the qualifying trust, shall be exempt from all claims of creditors and shall be excluded from an estate in bankruptcy, except that: (1) no exemption shall be allowed for any preferences or fraudulent conveyances made in violation of the "Uniform Fraudulent Transfer Act," R.S. 25:2–20 et seq., or any other State or federal law; . . .

. . . .

For purposes of this section, a "qualifying trust" means a trust created or qualified and maintained pursuant to federal law, including, but not limited to, section 401, 403, 408, or section 409 of the federal Internal Revenue Code of 1986 (26 *U.S.C.* § 401, 403, 408 or 409).

[*N.J.S.A.* 25:2–1, as amended by L.1993, c. 177.]

An IRA is created pursuant to Internal Revenue Code section 408. 26 *U.S.C.* § 408(d)(3)(governing IRAs created from rollover contribution from employee retirement plan). Thus, it is a "qualifying trust" under New Jersey law. *C.P., supra,* 293 *N.J.Super.* at 437, 681 *A.*2d 105; *In re Yuhas, supra,* 104 *F.*3d at 613.

*N.J.S.A.* 25:2–1 provides a "qualified immunity" for funds deposited in a New Jersey IRA. The purpose behind such expansive protection is to prevent creditors from attaching money earmarked for retirement. That immunity, however, is not absolute. *N.J.S.A.* 25:2–1(b). Creditors can attach funds transferred into an IRA in "preference" of other creditors, as a "fraudulent conveyance," or if the money is subject to a support order. *N.J.S.A.* 25:2–1(b); *C.P., supra,* 293 *N.J.Super.* at 437–38, 681 *A.*2d 105; *Assembly Financial Institutions Comm. Statement to Assembly Comm. Substitute for Assembly,* Nos. 288 and 1462 (Sept. 14, 1992). In exempting fraudulent conveyances from the otherwise broad-based immunity, the Legislature clearly intended to prevent debtors from using New Jersey law to shield their assets from creditors. This case requires the Court to determine whether

defendant's transfer constituted a fraudulent conveyance, thereby removing her IRA from the general exemption in *N.J.S.A.* 25:2–1.

## B.

R & H alleges that defendant transferred the assets in her ERISA fund to place them beyond the reach of her creditors. By rolling over the money into a New Jersey IRA, defendant was able to circumvent the New York restraining order and prevent collection of the New York judgment. As evidence of defendant's fraudulent intent, R & H argues that defendant never would have realized the benefit of the funds had she rolled them over to a New York IRA. The money would have been subject to seizure the moment defendant attempted a withdrawal. In transferring the money to New Jersey, defendant placed it beyond the reach of the New York judgment. Defendant could take an early withdrawal without hindrance. The fact that defendant was otherwise insolvent and had absolutely no contacts with New Jersey, R & H contends, is further evidence of her fraudulent intent. Moreover, R & H argues, transferring the funds in violation of the New York restraining order is, by itself, a fraudulent conveyance, thereby placing the funds outside the protection of *N.J.S.A.* 25:2–1(a).

Defendant, on the other hand, argues that her intentions were entirely proper. She contends that the money would have been exempt from levy in New York whether it was deposited in an ERISA or IRA account. The funds also were exempt from attachment in New Jersey, pursuant to *N.J.S.A.* 25:2–1(a). Because the funds were transferred from one protected account to another, and the roll-over did not affect the creditor's ability to access the funds, the creditor cannot complain that the transfer hindered or delayed its ability to satisfy its judgment. Defendant further argues that the timing of the rollover was not relevant. Defendant asserts that the transfer was not a fraudulent conveyance and is protected from attachment by *N.J.S.A.* 25:2–1(a).

## C.

*N.J.S.A.* 25:2–25 defines fraudulent conveyance. It provides that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

a. With actual intent to hinder, delay, or defraud any creditor of the debtor. . . .

[*N.J.S.A.* 25:2–25.]

The purpose of the Fraudulent Transfer Act, *N.J.S.A.* 25:2–20 to –34[3], is to prevent a debtor from placing his or her property beyond a creditor's reach. *In re Wintz Companies,* 230 *B.R.* 848, 859 (8th Cir.1999). Underlying the Act is the notion that a debtor cannot deliberately cheat a creditor by removing his property from "the jaws of execution." *See Klein v. Rossi,* 251 *F.Supp.* 1, 2 (E.D.N.Y.1966). Fraudulent conveyance claims thus allow the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection. *Hearn 45 St. Corp. v. Jano,* 283 *N.Y.* 139, 142, 27 *N.E.*2d 814, 816 (N.Y.1940).

In determining whether a transfer constitutes a fraudulent conveyance, there are two relevant inquiries. The first is "whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them" at some point in time "but for the conveyance." *In re Wolensky's Ltd. Partnership,* 163 *B.R.* 615, 626–27 (Bankr. D.C.1993); *Grand Lab., Inc. v. Midcon Labs of Iowa,* 32 *F.*3d 1277, 1282 (8th Cir.1994) (requiring creditor to "show that [it] would have received something which has become lost to [it] by reason of the conveyance."); *cf. In re Joel I. Kimmel,* 131 *B.R.* 223, 229 (Bankr.S.D.Fla.1991) (finding no fraudulent conveyance where defendant transferred funds from one form of exempt account to another since creditor could not have looked to account

---

[3] The Uniform Fraudulent Conveyances Law, *N.J.S.A.* 25:2–7 to –19, was repealed by the Uniform Fraudulent Transfer Act, effective January 1, 1989. *Flood v. Caro Corp.,* 272 *N.J.Super.* 398, 403, 640 *A.*2d 306 (App.Div.1994).

assets to satisfy claim). The second is whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor. Transfers calculated to hinder, delay, or defeat collection of a known debt are deemed fraudulent because of the debtor's intent to withdraw the assets from the reach of process. *Klein, supra,* 251 *F.Supp.* at 2; *In re Joel Kimmel, supra,* 131 *B.R.* at 229. Both inquiries involve fact-specific determinations that must be resolved on a case-by-case basis. The person seeking to set aside the conveyance bears the burden of proving actual intent. *United States v. McCombs,* 30 *F.*3d 310, 328 (2d Cir.1994); *Hassett v. Goetzmann,* 10 *F.Supp.*2d 181, 188 (N.D.N.Y.1998).

In determining whether the circumstances of a particular transaction give rise to the conclusion that the transferor intended to thwart or evade creditors, courts generally look to factors commonly referred to as "badges of fraud." "Badges of fraud" represent circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent. *Hassett, supra,* 10 *F.Supp.*2d at 188. As one court has stated, "badges of fraud"

> are said to be facts which throw suspicion on a transaction, and which call for an explanation.... More simply stated, they are signs or marks of fraud. They do not of themselves or per se constitute fraud, but they are facts having a tendency to show the existence of fraud [....] *"Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent...."*
>
> [*Schall v. Anderson's Implement, Inc.,* 240 *Neb.* 658, 484 *N.W.*2d 86, 91 (1992) (emphasis added) (citations omitted).]

*N.J.S.A.* 25:2–26 lists the "badges of fraud" that New Jersey courts are to consider in determining whether a debtor conveyed property with the actual intent to place it beyond the reach of creditors. That section provides:

> In determining actual intent under subsection a. of R.S. 25:2–25 consideration may be given, among other factors, to whether:
>
> a. The transfer or obligation was to an insider;

b. The debtor retained possession or control of the property transferred after the transfer;

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[*N.J.S.A.* 25:2–26.]

In determining actual intent to defraud, courts should balance the factors enumerated in *N.J.S.A.* 25:2–26, as well as any other factors relevant to the transaction. Accordingly, the Appellate Division made a critical error by giving controlling weight to the absence of two factors in a list of eleven. The proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud. *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 *F.*2d 1248, 1254–55 (1st Cir.1991) (*"Max Sugarman"*).

"[F]raudulent intent, by its very nature, is rarely susceptible to direct proof. . . ." *Marine Midland Bank v. Murkoff,* 120 *A.D.*2d 122, 508 *N.Y.S.*2d 17, 21 (1986), *appeal dismissed,* 69 *N.Y.*2d 875, 514 *N.Y.S.*2d 1029, 507 *N.E.*2d 322 (N.Y.1987). A defendant rarely will acknowledge that she transferred funds to place them beyond the reach of creditors. Actual intent often must be established through inferential reasoning, deduced from the circumstances surrounding the allegedly fraudulent act. *Max*

*Sugarman, supra,* 926 *F.*2d at 1254; *Hassett, supra,* 10 *F.Supp.*2d at 188; *Palmer v. Murphy,* 42 *Mass.App.Ct.* 334, 677 *N.E.*2d 247, 255, *review denied,* 425 *Mass.* 1103, 680 *N.E.*2d 102 (1997); *Marine Midland, supra,* 508 *N.Y.S.*2d at 20.

In this case, the transfer was laced with at least seven of the "badges of fraud" enumerated in *N.J.S.A.* 25:2–26.[4]  First, the transfer was to an "insider."  Although defendant technically does not fall within the definition of "insider" contained in *N.J.S.A.* 25:2–22(a) [5], an analysis of the purpose underlying the "insider" factor and fraudulent conveyance law in general undoubtedly supports the conclusion that she qualifies as an insider under the unusual facts of this case.

Simply stated, the list of "insiders" contained in *N.J.S.A.* 25:2–22(a) describes the relationship between the transferor and transferee.  The unifying theme among the enumerated persons is that they stand in such close relation to the debtor as to give rise to the inference that they have the ability to influence or control the debtor's actions.  *Norton Bankruptcy Law and Practice* 2d § 57:31 (1999) (defining insider).  Concluding that defendant is not an "insider" because the list does not specifically refer to transfers made to one's self elevates the technical over the substantive We refuse to give the statute such an unreasonable construction.

If a relative or business entity controlled by the debtor is an "insider," it follows that the debtor herself is an insider. Transactions with those entities allow the debtor to take the assets out of her name and place them beyond the reach of creditors.

---

[4] We need not address the question of whether the transfer of funds from the ERISA account to the IRA constituted a conveyance.  Courts in this state already have answered that question in the affirmative.  *E.g., Hawxhurst v. Hawxhurst,* 318 *N.J.Super.* 72, 723 *A.*2d 58 (App.Div.1998).

[5] *N.J.S.A.* 25:2–22(a) defines insider to include: a relative or debtor of the individual; a partnership in which the debtor is a general partner; another general partner in the debtor's partnership; a corporation in which the debtor is a person in control.

Since that is essentially what defendant did in this case, we conclude that she is an "insider" within the meaning of *N.J.S.A.* 25:2–26(a).

Second, defendant transferred the money to an account of which she was the beneficiary and over which she retained control. Had the money remained in the ERISA plan, the fund's trustee technically would have been in charge of it. By rolling the money over to an IRA, defendant gained greater control over the sums. Because defendant clearly retained possession and control of the property after the transfer, we find that factor (b) has been met. *N.J.S.A.* 25:2–26(b).

Third, indisputably, this transfer was made after the debtor had been sued or threatened with suit. *N.J.S.A.* 25:2–26(d). In fact, not only had defendant been sued, but R & H already had recovered a judgment against her.

Fourth, defendant confessed to transferring "substantially all" of her assets. *N.J.S.A.* 25:2–26(e). Defendant testified at her deposition that she had lost all of her money gambling. She claimed to have no assets other than the money vested in R & H's Profit Sharing Plan. She testified that she had closed out all of her New York bank accounts and her New York IRA, spending the money to fuel her gambling addiction. Although she admitted to owning a few pieces of jewelry and some furniture, they were of minimal value. She is unemployed, has no salary and no other source of income. Because defendant's only admitted asset is the money in the New Jersey IRA, we find that factor (e) has been met.

Fifth, in transferring the assets from New York to New Jersey, defendant effectively prevented them from being attached by R & H pursuant to the New York restraining order. *See N.J.S.A.* 25:2–26(g) ("The debtor removed or concealed assets.") Had R & H not been so quick to domesticate its foreign judgment, defendant could have withdrawn all of the money from the New Jersey IRA, leaving R & H with no remedy. The fact that defendant

transferred the money in violation of the New York restraining order is further evidence of her fraudulent intent.

Sixth, since defendant transferred the property after incurring a substantial debt to R & H, we find that factor (j) has been met as well. *N.J.S.A.* 25:2–26(j) (applying to transfers occurring shortly before or after a substantial debt is incurred.)

Seventh, defendant's own deposition testimony and affidavit of indigence establish that the sum of her debts is greater than her assets. *N.J.S.A.* 25:2–26(i) ("The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"). She claims that the money in the IRA is her only remaining asset. Because defendant owes R & H $226,455.93 and the value of the assets in her IRA is only $84,280.55, she is clearly insolvent within the meaning of *N.J.S.A.* 25:2–23(a). ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets . . ."). Accordingly we find that factor (i) has been met.

Because the record establishes that seven badges of fraud are present, we find that defendant transferred the money to secure access to the funds with the intent to hinder or delay R & H's ability to satisfy its New York judgment. By focusing on concealment, the Appellate Division placed paramount weight on a factor that is only marginally relevant here. The panel reasoned that there was no fraudulent conveyance because R & H knew about the transfer and was the one to effectuate it. That analysis, however, ignores the critical fact that R & H had no choice but to make the transfer. 29 *U.S.C.* § 1104 (requiring trustee to administer plan solely in interests of employees); *Frary v. Shorr Paper Products, Inc.,* 494 *F.Supp.* 565, 568–69 (N.D.Ill.1980) (holding that plan trustee could not deny participant lump-sum payment).[6] Courts examining fraudulent transfers uniformly have held that "the creditor need establish only that the transferor intended by

---

[6] Because neither party disputes this contention, we assume that the terms of the Plan require the trustee to honor all beneficiary requests to withdraw funds.

the conveyance to avoid payment of his obligation or to hinder its collection. . . ." *Reconstruction Fin. Corp. v. United Distillers Prod. Corp.*, 229 *F*.2d 665, 667 (2d Cir.1956). The openness and veracity of the transaction is irrelevant where other factors establish the debtor's intent to impede exaction. *Boston Trading Group, Inc. v. Burnazos*, 835 *F*.2d 1504, 1508 (1st Cir.1987); *United States v. Tabor Court Realty Corp.*, 803 *F*.2d 1288, 1296–97 (3d Cir.1986), *cert. denied, McClellan Realty Co. v. United States*, 483 *U.S.* 1005, 107 *S.Ct.* 3229, 97 *L.Ed.*2d 735 (1987). Accordingly, we find that R & H's knowledge of the transfer is insufficient to counteract the other badges of fraud that accompanied this conveyance.

■ We also disagree with defendant's assertion that the funds are protected because they were moved from one trust account to another. Missing from that analysis is consideration of the benefit defendant reaped by transferring the funds out of New York into New Jersey. It is true that R & H could not have reached the money while it remained in the ERISA plan. *Guidry, supra*, 493 *U.S.* at 376, 110 *S.Ct.* at 687, 107 *L.Ed.*2d at 795. That, however, is where the inquiry begins, not ends. Defendant never would have been able to use the money in that account. Withdrawals would have been subject to attachment pursuant to the New York restraining order. *National Bank of N. Am. v. International Bhd. of Elec. Workers Local # 3*, 93 *Misc.*2d 590, 400 *N.Y.S.*2d 482 (N.Y.Sup.Ct.1977), *aff'd*, 69 *A.D.*2d 679, 419 *N.Y.S.*2d 127, *appeal dismissed*, 48 *N.Y.*2d 752, 422 *N.Y.S.*2d 666, 397 *N.E.*2d 1333 (1979). *See also Pulasty, supra*, 136 *N.J.* at 356, 642 *A.*2d 1392 (holding ERISA anti-alienation provision does not apply to funds in pensioner's possession); *Hawxhurst, supra*, 318 *N.J.Super.* at 86, 723 *A.*2d 58; *Velis v. Kardanis*, 949 *F*.2d 78 (3d Cir.1991) (concluding pension benefits were includable asset of bankruptcy estate once distributed); *In re Houck*, 181 *B.R.* 187, 189 (Bankr. E.D.Pa.1995) (concluding that ERISA's anti-alienability provision does not protect pension funds once they are distributed); *NCNB Fin. Servs., Inc. v. Shumate*, 829 *F.Supp.* 178, 180

(W.D.Va.1993)(stating funds no longer protected from alienation once in pensioner's possession), *aff'd,* 45 *F.*3d 427 (4th Cir.1994), *cert. denied,* 515 *U.S.* 1161, 115 *S.Ct.* 2616, 132 *L.Ed.*2d 859 (1995). By transferring the money to an account in New Jersey, defendant bypassed the New York judgment and evaded her creditor.

We also disagree that the funds would have been protected had they been transferred to a New York IRA. Although New York law generally exempts IRA funds from attachment by creditors seeking to enforce money judgments, *C.P.L.R.* § 5205(c); *Bank Leumi Trust Co. of New York v. Dime Sav. Bank of New York,* 85 *N.Y.*2d 925, 626 *N.Y.S.*2d 999, 650 *N.E.*2d 846 (1995), that exemption is unavailable where the debtor secretes funds into an IRA in an attempt to avoid paying a money judgment. *C.P.L.R.* § 5205(c)(5) [7]; *Pauk v. Pauk,* 232 *A.D.*2d 392, 648 *N.Y.S.*2d 134, 135 (1996); *Tompkins County Trust Co. v. Gowin,* 163 *Misc.*2d 418, 621 *N.Y.S.*2d 476, 478 (N.Y.Sup.Ct.1994) (stating general exemption for IRAs not available where asset is transferred within ninety days before action in which judgment is entered against defendant). Under New York's Debtor and Creditor law, the conveyance also would be void since it was "made [by] a defendant ... [during the pendency of an action] for money damages or [after] a judgment ... has been docketed...." (N.Y. Debtor and Creditor Law § 273–a, McKinney 1990). Because the money would not have been immune from attachment in New York, defendant effectuated the transfer in hopes the money would be protected by *N.J.S.A.* 25:2–1. Attempting to place the money beyond her creditor's reach is the essence of a fraudulent conveyance. We are certain that the Legislature did not intend to

---

[7] *C.P.L.R.* § 5205(c)(5) provides:

> Additions to an [individual retirement account qualified under § 408 of the Internal Revenue Code] shall not be exempt from application to the satisfaction of a money judgment if (i) made after the date that is ninety days before the interposition of the claim on which such judgment was entered....

allow debtors to funnel money into a New Jersey IRA to thwart the judgments of sister states. *N.J.S.A.* 25:2–1(b).

### III.

In sum, the totality of the circumstances clearly and convincingly demonstrates that defendant intended to hinder, delay, and defraud her creditor, R & H. Nearly all of the classic indicia of fraud are present here. Defendant transferred her only remaining asset after a judgment had been entered against her. *N.J.S.A.* 25:2–26(d),(e),(j). The transfer was in violation of a restraining order. *N.J.S.A.* 25:2–26(g). She retained possession of the asset after the transfer. *N.J.S.A.* 25:2–26(b). In fact, by transferring the asset, defendant gained greater control over it. Moreover, by transferring the asset to New Jersey, defendant was able to evade enforcement of the New York judgment. *N.J.S.A.* 25:2–26(g).

Coupling these "badges of fraud" with defendant's previous actions and admissions leads to the inevitable conclusion that she was using the New Jersey IRA account to evade enforcement of the New York judgment and restraining order. At a deposition in October 1994, defendant testified that she had closed out her New York bank accounts and cashed in the money in her New York IRA, despite the restraining order that prohibited her from spending any money.[8] Defendant's own testimony further established that she opened a checking account at NatWest Bank in Fort Lee, New Jersey because she could not get any money out of her New York accounts. In light of defendant's previous actions, it is plain that defendant transferred her pension money out of New York to shield it from her creditor.

We do not suggest that a court must find a specific number of factors before characterizing a transaction as fraudulent. In some cases, the presence of a single factor may suffice. *In re Ingersoll,*

---

[8] One bank account remained open in New York because it had been frozen pursuant to the restraining order served on defendant in September 1994.

124 *B.R.* 116, 122 (M.D.Fla.1991). Where several badges of fraud accompany one transaction, however, a strong inference of fraud arises. *Ibid.* Unless a sufficient explanation is supplied, clearly rebutting the inference of actual fraudulent intent, the conclusion that the debtor possessed the requisite intent is inescapable. In this case we have no doubt that defendant acted with an actual intent to hinder, delay, and defraud her creditors.

The judgment of the Appellate Division, therefore, is reversed.

*For reversal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.