NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3372
_____

MSKP OAK GROVE, LLC,
a limited liability company of Florida,

Appellant

v.

CAROL VENUTO, individually and as executrix of the
Estate of Ralph A. Venuto, Sr., deceased;
RALPH A. VENUTO, JR.; CAROL REBBECCHI;
RICHARD P. VENUTO;
HOLLYWOOD TANNING SYSTEMS, INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1:10-cv-06465)
District Judge: Honorable Robert B. Kugler

_____

Argued: October 28, 2020

Before: McKEE, BIBAS, and NYGAARD, *Circuit Judges*

(Filed: December 21, 2020)
_____

Joseph A. Molinaro          [ARGUED]
648 Wyckoff Avenue
Wyckoff, NJ 07481
    *Counsel for Appellant*

Dimitri L. Karapelou        [ARGUED]
1500 JFK Boulevard
Suite 920
Philadelphia, PA 19102
    *Counsel for Appellees*

_____

OPINION[*]

_____

BIBAS, *Circuit Judge*.

For more than a decade, MSKP has pursued Hollywood Tanning and the Venuto family across two states and three courts. The chase is not over yet. MSKP has offered strong evidence that by taking large shareholder distributions from Hollywood Tanning, the Venutos may have defrauded MSKP as a creditor, intentionally or not. To give MSKP its full day in court, we will vacate and remand.

## I. BACKGROUND

### A. Hollywood Tanning Systems and MSKP

Hollywood Tanning Systems operated tanning salons and sold franchises and tanning equipment across the country. It was founded in 1994 by the late Ralph Venuto, Sr., who made his wife and three children officers and shareholders in the business. Collectively, they owned all the shares.

Hollywood Tanning was very successful. It expanded to roughly 320 salons across the country. During its first thirteen years, fewer than ten of the salons closed permanently. Most of the salons were owned and run by franchisees.

Hollywood Tanning used the same lease arrangement with almost all its franchisees: It was the tenant on a lease and then subleased the location to a franchisee. The franchisees

---

[*] This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

paid rent directly to the landlord. But if a franchisee defaulted, Hollywood Tanning was on the hook. In 2007, MSKP Oak Grove bought a Florida shopping center and so became the landlord of one of Hollywood Tanning's locations.

## B. The 2007 sale agreement

In 2006, ACI Capital expressed interest in buying Hollywood Tanning, and the Venutos were open to the idea. ACI valued Hollywood Tanning at $70 million. It spent months doing due diligence on the company. And it formed Tan Holdings to buy Hollywood Tanning's assets.

In April 2007, Tan Holdings and Hollywood Tanning signed a "Contribution and Asset Purchase Agreement." App. 1197. Tan Holdings would buy Hollywood Tanning's assets by paying $40 million in cash and assuming its debts. Hollywood Tanning would get 25% of the shares in Tan Holdings, which ACI valued at $10 million (25% of $40 million). And if Tan Holdings hit certain profit targets, Hollywood Tanning would get earn-out payments for a few years.

Tan Holdings thus took over most of Hollywood Tanning's assets and liabilities, but not all. Among other liabilities, Hollywood Tanning kept fifty-seven franchise leases, including the one with MSKP.

## C. The closing and later transfers

Two months later, the parties closed the deal. They divided the $40 million cash payment, minus some costs and adjustments, among a few accounts. They put $5 million into escrow for post-closing changes in price. Tan Holdings then wired $23.4 million directly to the Venutos ($5.9 million each) and the remaining $4.3 million to Hollywood Tanning.

3

Later that day, Hollywood Tanning transferred most of its money out, including $1.85 million to pay down the mortgage of the Venutos' house at the Jersey Shore, a $400,000 loan to the Venutos' pizza franchise, and $350,000 in dividends to the shareholders (the Venutos). By the end of the day, Hollywood Tanning had only $117,647 in cash left.

In the months after the closing, the Venutos repeatedly had to inject cash into Hollywood Tanning. For instance, they deposited $90,000 so that it could pay for its insurance. They also wired $1.4 million back in because the escrowed amount was not enough to cover the post-closing price adjustment.

By the end of 2007, Hollywood Tanning's tax return showed a loss of $3.86 million. In 2008, it defaulted on its lease with MSKP.

### D. Procedural history

After sending a notice of default, MSKP sued Hollywood Tanning in Florida state court and won a judgment. It then learned that Hollywood Tanning had become insolvent. So it sued the Venutos and Hollywood Tanning in federal court, this time under New Jersey's Uniform Fraudulent Transfer Act, N.J. Stat. Ann. §§ 25:2-20 to -34.

The late Judge Simandle presided over the case. He dealt with several dispositive motions and held a bench trial on MSKP's claims of intentional fraud, constructive fraud, and fraudulent conveyance. Sadly, he passed away soon after the trial. He had not yet published his findings of fact and conclusions of law. The current District Judge graciously took over the case and its extensive record. The District Court ruled for the Venutos. It held that, on all three claims, MSKP had failed to prove fraud by clear and convincing evidence.

4

MSKP now appeals. As the parties agree, we apply New Jersey law to this diversity case. We review the District Court's findings of fact for clear error and its conclusions of law de novo. *Lehman Bros. Holdings v. Gateway Funding Diversified Mortg. Servs., L.P.*, 785 F.3d 96, 100 (3d Cir. 2015). Ordinarily, we would defer greatly to the District Court's findings of fact. But because of Judge Simandle's passing, we recognize that the District Court did not have the benefit of seeing the witnesses and hearing the testimony at trial. Instead, it read a cold record like the one before us. So we will review the whole record more carefully.

## II. THE DISTRICT COURT ERRED IN REJECTING MSKP'S CLAIM OF INTENTIONAL FRAUD

### A. MSKP challenges the District Court's findings on seven badges of fraud

MSKP's three claims all challenge the transfers to the Venutos on the day of closing (including the $23.4 million distributions), not the asset sale itself. To start, it claims that these distributions were intentionally fraudulent transfers. Under New Jersey's statute, a debtor commits intentional fraud by making a transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." N.J. Stat. Ann. § 25:2-25(a). To set aside the transfers, MSKP bears the burden of showing Hollywood Tanning's "actual intent" by clear and convincing evidence. *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 489 (N.J. 1999). Because debtors rarely admit fraudulent intent, courts must usually infer it. *Id.* at 490. In drawing that inference, courts may consider eleven badges of fraud set forth in the statute. N.J. Stat. Ann. § 25:2-26(a)–(k).

When looking for badges of fraud, courts ask not whether some of the eleven are absent, but whether some are present. *Gilchinsky*, 732 A.2d at 489–90. Even one badge of fraud can suffice to "cast suspicion on the transferor's intent." *Id.* at 490. If there are several badges, that creates a strong presumption of intent to defraud. *Id.* at 493; *see id.* at 490. The debtor must then "clearly rebut[ ]" that inference. *Id.* at 493.

The District Court found that MSKP had not shown that Hollywood Tanning intended to defraud its creditors. In making that finding, it looked at all eleven badges but did not explicitly find any of them present. On appeal, the parties do not dispute the court's findings that badges (d), (f), (j), and (k) were absent. But in their briefs, the parties do dispute the findings on the other seven badges. As explained below, we find strong evidence for three of those seven badges but not a fourth. The remaining three need more factfinding on remand.

**B. Three badges of fraud are present by clear and convincing evidence**

1. *The shareholder distributions were transfers from Hollywood Tanning to insiders*. Start with the first badge of fraud: whether "[t]he transfer or obligation was to an insider." N.J. Stat. Ann. §25:2-26(a). As the Venutos conceded at argument, badge (a) is present. The Venutos were "officer[s]" and "in control" of the corporation. *Id.* §25:2-22. The money they got at closing was wired by Tan Holdings but considered "distribution[s] for Hollywood Tanning." App. 108.

Though the District Court made a similar finding, it also found that neither the asset sale nor the MSKP lease was related to insiders. That does not matter. MSKP challenges

6

only the shareholder distributions. *MSKP Oak Grove, LLC v. Venuto*, 875 F. Supp. 2d 426, 439 (D.N.J. 2012) (Simandle, J.). For that transfer, badge (a) is present.

2. *Hollywood Tanning did not get a "reasonably equivalent" value for the transfer.* Badge (h) is present too, because Hollywood Tanning did not get "reasonably equivalent" value for its shareholder distributions. § 25:2-26(h). As the Venutos and Hollywood Tanning concede, the shareholders took $23.4 million at closing without giving Hollywood Tanning anything in return.

The District Court did not find this. Instead, it stressed that the amount distributed to the shareholders was unrelated to the amount Hollywood Tanning owed MSKP. But that does not matter. Badge (h) focuses on the transfers between Hollywood Tanning and the *shareholders*, not between Hollywood Tanning and MSKP. The District Court misapplied that legal standard, overlooking clear and convincing evidence of badge (h).

3. *Hollywood Tanning removed assets.* Finally, there is strong evidence of a third badge of fraud: whether Hollywood Tanning "removed or concealed assets." § 25:2-26(g). The District Court found that Hollywood Tanning never concealed the shareholder distributions. Even so, as the court seemingly acknowledged, it did *remove* assets. The $23.4 million went from corporate to individual accounts, out of the reach of creditors. Though the Venutos try to distinguish shareholder distributions from removals, nothing in the statute or case law draws that distinction. *Cf. Gilchinsky*, 732 A.2d at 490–491 (finding that debtor removed assets by transferring them from her ERISA account to her IRA). Badge (g) is present too.

7

Even one badge of fraud can trigger a presumption of fraud. *Gilchinsky*, 732 A.2d at 490, 493. But here there are several, providing "conclusive evidence" of fraudulent intent. *Id.* at 490. The Venutos must rebut it with a "sufficient explanation." *Id.* at 493. The District Court erred in not reaching that analytical step and must address it on remand.

### C. One badge is absent; three need more factfinding on remand

We could stop here. But to guide the remand, we address the remaining four badges. One is absent, but three others are unclear and require more factfinding.

1. *Hollywood Tanning did not retain control over the transferred funds.* Badge (b) asks whether "[t]he debtor retained possession or control of the [funds] after the transfer." § 25:2-26(b). The District Court found that Hollywood Tanning did not. MSKP tries to equate the *shareholders*' control of the funds with the *debtor*'s control. But the corporation is distinct from its shareholders, and MSKP makes no argument for piercing the corporate veil. So the District Court properly found that badge (b) was absent.

2. *The shareholder distributions may have been concealed.* We are not as sure about badge (c): whether the transfer was "disclosed or concealed." § 25:2-26(c). The District Court found that the distributions were not concealed but did not explain how or when they were disclosed. The record before us does not show that either. The Venutos say that Hollywood Tanning disclosed the shareholder payouts on its 2007 tax return. But we have only the first page of that return, which does not show those transfers. Nor are they listed in Hollywood Tanning's 2007 general ledger, because Tan Holdings wired the $23.4 million directly to the Venutos. Without more, we cannot know whether they were concealed.

8

3. *Hollywood Tanning may have transferred substantially all its assets.* We are also unsure about badge (e): whether "the transfer was of substantially all the debtor's assets." §25:2-26(e). The District Court found that it was not, but it cited nothing in the record to support that finding. In fact, the record suggests otherwise. The sale apparently left Hollywood Tanning with few assets. On closing day, its cash reserves shrank to $117,647. Though the Venutos claim that it still had many accounts receivables, the general ledger in the record ends the day *before* the asset sale. So it is unclear which accounts receivables were left after the sale closed.

After closing, Hollywood Tanning's most substantial asset was probably its 25% equity interest in Tan Holdings, which ACI had valued at $10 million. Yet those shares may have had "minimal real value." *MSKP Oak Grove*, 875 F. Supp. 2d at 436. As the late Judge Simandle observed, to pay Hollywood Tanning its $40 million, Tan Holdings had to take out a loan. *Id.* at 436 n.3. That debt probably dragged down the shares' value. *Id.* And the shares were in a closely held corporation, making them illiquid and probably worthless. *Id.*

Because we are not sure of the shares' fair market value, we do not know whether the sale left Hollywood Tanning with substantial assets. To resolve badge (e), the District Court must grapple with these factual questions on remand.

4. *Hollywood Tanning may have been insolvent at the time of the transfer.* Lastly, there are open factual questions on badge (i): whether "the debtor was insolvent or became insolvent shortly after the transfer was made." §25:2-26(i). The statute defines insolvency as having debts that exceed the fair value of all assets. §25:2-23(a). The District Court found that Hollywood Tanning was not insolvent and managed to pay MSKP for some time after

9

the sale. It stressed that the company's assets balanced out its liabilities on June 21, 2007. But that was the day *before* the asset sale closed. We do not know its debts or assets *after* the sale. The court never calculated the sum of its debts nor the value of its 25% equity interest.

Although we lack exact numbers, the record suggests that Hollywood Tanning's debts exceeded its assets after the sale and distributions. The Venutos' large, repeated cash infusions suggest that the company was flailing. Even before the sale, the Venutos seemed to know that the company would lack assets. In an email before the closing, Ralph Venuto, Jr., wrote that it was in a landlord's "best interest" to settle a delinquent lease with the company because "there won't be any assets left in [Hollywood Tanning]" after the sale. App. 1349–50. Unless the District Court finds that the numbers show otherwise, it looks likely that Hollywood Tanning became insolvent after the shareholder distributions.

In short, three badges of fraud are present: (a), (g), and (h). Three others may be present: (c), (e), and (i). On remand, the District Court will have to find facts on the open issues, and the Venutos will bear the burden of rebutting the presumption of fraudulent intent.

### III. THE DISTRICT COURT ERRED IN REJECTING MSKP'S CLAIM OF CONSTRUCTIVE FRAUD

Next, MSKP claims that the shareholder distributions amounted to constructive fraud. Under the Act, a transfer is constructively fraudulent if the debtor does not get "a reasonably equivalent value in exchange" and the remaining assets "were unreasonably small in relation to the business or transaction." N.J. Stat. Ann. §25:2-25(b)(1). The District Court rejected this claim based on two findings: One, there was no evidence of how much debt

10

Hollywood Tanning owed MSKP at or after the sale. And two, there was also no evidence that Hollywood Tanning defaulted on the lease at the time of the sale or right after it.

Neither of these findings, however, disposes of MSKP's claim. First, the challenged transfers are the distributions to shareholders. As the Venutos conceded at argument, they gave nothing in return for the $23.4 million that Hollywood Tanning wired directly to them. Second, the statute asks us to compare the leftover assets to "a transaction" or to "the business" as a whole. *Id.* So it is not enough that Hollywood Tanning could pay rent to MSKP. It also needed assets to meet its other debts, including its fifty-six leases with other landlords. *See Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1069–70 (3d Cir. 1992) (reading "unreasonably small capital" under Pennsylvania's Uniform Fraudulent Conveyance Act as "an inability to generate enough cash flow to sustain operations" and "pay obligations as they become due").

On remand, the District Court will have to investigate the value of the 25% equity shares in Tan Holdings and whether Hollywood Tanning could have sold them to meet its debt. The court erred in denying the constructive-fraud claim without reaching these issues.

### IV. THE DISTRICT COURT ERRED IN REJECTING MSKP'S CLAIM OF A FRAUDULENT TRANSFER AS TO A PRESENT CREDITOR

MSKP's third and final claim is that the shareholder distributions were a "fraudulent transfer" as to a "present creditor[ ]." N.J. Stat. Ann. § 25:2-27. That happens when a debtor does not get a "reasonably equivalent value" in return for a transfer and the debtor either is insolvent or becomes insolvent because of the transfer. *Id.* § 25:2-27(a). The creditor's claim must have "ar[i]se[n] before the transfer was made." *Id.*

11

The District Court erred in rejecting this claim too. It found that MSKP's claim arose after the transfers because Hollywood Tanning did not default on its lease until later. But the Act's definition of "claim" is broader than current rent payments. It includes any "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 25:2-21. As the landlord, MSKP had a claim contingent on Hollywood Tanning's default. So MSKP still counted as a creditor. On remand, the court will have to decide whether the company became insolvent because of the transfers to shareholders.

\* \* \* \* \*

On intentional fraud, MSKP has proven three badges of fraud and raised open questions about three others. Those badges support an inference of fraud that the Venutos must rebut. And on constructive fraud and fraudulent transfer, the District Court must find more facts and apply the right legal standard. We will vacate and remand to let it do so. MSKP's chase continues.