**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1259-24

CHARLES K. GEYER,

    Plaintiff-Appellant,

and

GFTA LLC and CCLLGG, LLC,

    Plaintiffs,

v.

CHARLES W. GEYER, ARLYNE
D. GEYER, DEBRA A. GOLDBERG,
CHERYL MONOD, and DAVID P.
GERMAINE,

    Defendants-Respondents,

and

REVERSE MORTGAGE FUNDING
LLC, RONALD T. NAGLE, ESQ.,
and JUNGKIL HAN,

    Defendants.

_____

Submitted March 11, 2026 – Decided April 16, 2026

Before Judges Gummer and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000093-20.

Peter A. Ouda, LLC, attorney for appellant (Peter A. Ouda, on the brief).

Ambrosio & Associates, LLC, attorneys for respondents (John T. Ambrosio, on the brief).

PER CURIAM

Plaintiff Charles K. Geyer appeals from a December 23, 2024 judgment that determined defendant Arlyne D. Geyer (Arlyne), his mother, was the owner of real property located in Vernon, New Jersey (the Property) and that three mortgages he had sought to enforce were invalid. Applying well-established legal precedent, we vacate and remand for further proceedings consistent with this opinion.

I.

We glean the facts and procedural history from the record. In October 2020, plaintiff, CCLLGG, LLC (CCLLGG) and GFTA, LLC (GFTA) filed a verified complaint. They named as defendants Arlyne, plaintiff's father Charles W. Geyer (Charles), his sisters Debra Goldberg and Cheryl Monod, notaries Jungkil Han and David P. Germaine, Reverse Mortgage Funding, LLC (Reverse

2

Mortgage), and Ronald T. Nagle, Esq.[1] Plaintiff alleged "[a]t certain times" he was the owner of the Property. He asserted that he was the sole member of CCLLGG and GFTA. He alleged on October 28, 2004, Arlyne had granted CCLLGG a mortgage on the Property to secure a loan to her in the amount of $418,360.43. Further, he asserted on December 13, 2006, Arlyne had granted GFTA a mortgage on the Property to secure a loan to her in the amount of $747,458.08.

Plaintiff contended on March 12, 2015, the Property, without his knowledge and over his forged signature, had been deeded to SYAS, LLC (SYAS). He alleged the mortgages had not been paid off at the time of the alleged transfer to SYAS. Plaintiff asserted that on September 14, 2016, Charles had discharged the mortgages as "Pres and CEO" of CCLLGG and GFTA, although he did not have that authority.

Plaintiff alleged on January 30, 2017, a deed transferred the Property from SYAS to Arlyne. He stated Arlyne had signed the deed as the one hundred percent owner of SYAS. Plaintiff contended on November 3, 2017, Arlyne had granted him a mortgage on the Property in the amount of $1,000,000. He

---

[1] Plaintiff's claims against Han were not pursued. Plaintiff, Reverse Mortgage, and Nagel settled their claims before trial.

A-1259-24

alleged, however, this mortgage was discharged on September 19, 2019, over his forged signature and the obligation was never satisfied.

Finally, plaintiff alleged two additional mortgages encumbered the Property. The first, dated October 24, 2019, was to Reverse Mortgage in the amount of $2,100,000. The second was to Goldberg and Monod on January 31, 2020, in the amount of $1,400,000.

Plaintiff claimed his, CCLLGG's, and GFTA's mortgages were valid; he still owned the Property; and the mortgages to Reverse Mortgage and Goldberg and Monod were void.

In a counterclaim, Arlyne and Charles alleged plaintiff owed them "in excess of $1,000,000 in connection with various loans and other financial transactions between" them and sought payment of that purported debt. They also claimed plaintiff had "improperly signed or misrepresented" Arlyne's signature on a mortgage on the Property he had recorded and had maliciously abused the legal process and had wrongfully placed a cloud on the title of the Property by filing this lawsuit. In a counterclaim, Germain alleged plaintiff owed him "for commissions due and for monies lent in connection with various loans and other financial transactions between the parties."

4

On April 6, 2023, the court granted plaintiff's motion for partial summary judgment, declaring void and discharging Arlyne's and Charles's mortgage to Goldberg and Monod. In its statement of reasons accompanying the order, the court noted neither Goldberg nor Monod had opposed the motion. The court stated Goldberg and Monod had denied any knowledge of the mortgage or making a loan to Charles and Arlyne during their depositions.

On June 30, 2023, the court heard the parties' arguments regarding plaintiff's motion to restore the CCLLGG and GFTA mortgages. Plaintiff acknowledged that the State of New Jersey had revoked the status of the businesses and that there were no promissory notes underlying the mortgages. Nevertheless, he argued the businesses could "be reinstated for the purposes of suing or to be sued, so that they could wind up their affairs" or he could "pursue the [mortgages] in his own name" because he "ha[d] been the [one hundred] percent member of both" LLCs. Further, despite the absence of written notes, he argued the obligation was acknowledged by the parties.

Plaintiff asserted he had provided evidence of "the wire transfer to . . . CCLLGG of [$]418,000" and "[t]he other amount through GFTA." He contended these amounts were "to fend off a foreclosure that was going to displace" Charles and Arlyne. Further, he contended Charles had discharged the

A-1259-24

mortgages without authority and misrepresented they had been satisfied. Plaintiff argued the facts were not disputed by the other parties. Alternatively, he argued he was entitled to an "equitable mortgage."

Reverse Mortgage cross-moved for dismissal of the pleading, arguing CCLLGG and GFTA were revoked businesses, and it sought their dismissal from the matter and denial of plaintiff's motion to reinstate. Further, Reverse Mortgage argued reinstating the mortgages made "no sense" because "plaintiff admit[ted] that those mortgages are outside the chain of title" as plaintiff was "in title,"[2] not Arlyne. Moreover, there were no notes, and without notes, there was no obligation for the mortgages to secure. Finally, Reverse Mortgage argued the assertion of an equitable mortgage "chang[ed] the factual basis of the motion" and plaintiff's argument was based on inadmissible evidence.

On June 30, 2023, the court entered an order and placed its decision on the record, denying plaintiff's motion. The court found the CCLLGG and GFTA mortgages "could not possibly [be] in the chain of title" because they were "against the wrong party," there was no "note to back . . . up" the mortgages, and the status of the businesses had been revoked. Therefore, the court concluded "it's simply impossible . . . to grant" plaintiff's motion. The court

---

[2] The transcript refers to "in title" as "entitled."

A-1259-24

stated "maybe ultimately at a trial things will turn out differently. But there are so many facts in dispute here that it would be absolutely impossible to grant" plaintiff's motion.

The court granted Reverse Mortgage's cross-motion to dismiss CCLLGG and GFTA from the matter. In its decision, the court found that because the status of businesses had been revoked, they did not exist and, therefore, they could not be parties to the action.

The matter proceeded to trial over four days.[3] Following trial, in a seven-page written statement of reasons accompanying the December 23, 2024 judgment, the trial court detailed the history of transactions concerning the Property. The court found Charles and Arlyne had purchased the Property on August 16, 1978. On January 2, 1998, Charles transferred his interest in the Property to Arlyne. On March 15, 2002, Arlyne transferred the Property to plaintiff. The next day, plaintiff transferred the Property back to Arlyne. Charles and Arlyne continued to reside in the home, and plaintiff "lived elsewhere." On October 29, 2004, Arlyne deeded the Property to plaintiff. On

---

[3] At the time of trial, Charles had passed away and his Estate was substituted in as a defendant for him. Further, Arlyne did not testify and passed away after the trial on December 5, 2024.

A-1259-24

March 15, 2015, plaintiff "allegedly transferr[ed] title . . . to SYAS . . . a corporation owned by" Arlyne. The court stated plaintiff had denied he ever "transferred title out" after taking "title to the [P]roperty in 2002."

The trial court considered findings it had made in another matter involving plaintiff and Charles, Arch Financial Services v. Geyer, No. A-2332-11 (App. Div. Oct. 10, 2013). The court noted in the other matter it had found Charles, "to avoid a creditor, . . . [had] transfer[red] . . . his only asset to" plaintiff, which "was invalid as it was a fraudulent attempt to avoid a creditor['s] . . . right." The court stated it had "concluded neither Charles . . . or [plaintiff] were truthful."

In this matter, the court found "by a preponderance of the evidence that during the relevant period of time, Charles . . . was in debt and in order to avoid payment, would forge documents to [make it] appear that the debt had been paid or that asset was owned by another."

The trial court "accept[ed] that [plaintiff] did not execute" the March 15, 2015 deed to SYAS. However, the court stated "[t]hat conclusion d[id] not resolve the ownership issue . . . ." The court "view[ed] the family history and particularly the conduct of Charles" and "conclude[d] that the deed to [plaintiff] dated October 29, 2004 was a fraudulent transfer, [and] therefore title remained in [Arlyne]'s name."

A-1259-24

The court found "by clear and convincing evidence that [the] transfers of title to Arlyne, then to [plaintiff] were for the explicit purpose of avoiding creditors." The court stated "[t]he issues in this case [we]re somewhat unusual as there [wa]s no evidence of a creditor seeking to set aside the transfer." Nevertheless, the court found "there are creditors which could have instituted the claim to set aside the transfers." In addition, the court took "judicial notice of an order of March 5, 2021 vacating a warrant of satisfaction regarding a debt owed to Maybruch & Zapcic, LLC in the amount of $20,000." The court found the "judgment as well as others were improperly discharged of record on March 21, 2017. The total debt discharged was" over $400,000.

The court applied the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34.[4] Specifically, under N.J.S.A. 25:2-26, the court found:

> (a) The transfer was [from Charles] to his son. Clearly an insider.
>
> (b) [Charles] continued to live there just as he always had. [Plaintiff] did not.
>
> (c) The transfer to [plaintiff] was known to the family.
>
> (d) The evidence [wa]s clear that there were judgments in excess of $400,000[]. The issues raised in the Arch case and the bankruptcy.

---

[4] Effective August 10, 2021, the UFTA became the Uniform Voidable Transaction Act, N.J.S.A. 25:2-20 to -36.

(e) The house was essentially [Charles's] only asset.

(f) The debtor did not abscond.

(g) There is a clear pattern of concealing assets at least employing forged documents.

(h) The amount of debt is not clear due to [Charles's] passing but the amount is considerable.

(i) Once the house was transferred, there is no evidence of any significant assets remaining in the name of Charles . . . .

(j) The judgments existed at the time of the transfer.

In addition, the court found "there [wa]s no evidence presented which would explain the transfer to" plaintiff. There was "no evidence of estate planning nor [wa]s there evidence there even was an estate to plan." The court found Charles "was in financial distress" and "[m]oving title to [plaintiff] was clearly an attempt to protect his home from creditors. Given the evidence, there can be no other conclusion." The court concluded "[t]itle to the [P]roperty . . . revert[ed] to Arlyne . . . ."

Additionally, the court considered the alleged mortgages. As to the mortgages given to CCLLGG and GFTA, the court referenced its June 30, 2023 order denying plaintiff's motion to reinstate the mortgages. The court stated it had "concluded that there was no note presented and the charters of the two

lenders w[ere] revoked." The court stated "no one at trial or before challenged" its prior decision. Further, the court found Arlyne's signature was forged on the November 3, 2017 mortgage. Nevertheless, the court accepted plaintiff had acknowledged Arlyne "held title to the [P]roperty on that date as he participated in the loan transaction." The court found "the alleged debts relating to the mortgage [we]re not present."

The court entered a judgment providing title to the Property was vested in Arlyne, by the deed of March 16, 2002, and the three mortgages were "invalid and unenforceable."[5]

II.

On appeal, plaintiff argues the trial court erred by: denying his request to reinstate the mortgages of CCLLGG and GFTA; failing to decide whether he has an equitable mortgage; concluding Arlyne's October 2004 transfer of the Property to him violated the UFTA; and finding the October 2004 transfer from Arlyne lacked consideration. Plaintiff contends Charles and Arlyne "reaped a financial windfall." He requests we vacate the judgment, enter judgment in his

---

[5] Plaintiff has not briefed the court's finding that the November 3, 2017 mortgage was forged and therefore invalid. Thus, those issues are deemed waived on appeal. See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505-06 n.2 (App. Div. 2015) ("An issue that is not briefed is deemed waived upon appeal.").

favor transferring title to his name and reinstating his mortgages, and remand for a trial on his damage claims.

We begin with the established standard of review in an appeal from a bench trial. "The scope of appellate review of a trial court's fact-finding function is limited." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 411 (1998)). We review final determinations made by the trial court "premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). Our Supreme Court has recognized "an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020). "[W]e defer to the trial court's credibility determinations because it 'hears the case, sees and observes the witnesses, and hears them testify, affording it a better perspective than a reviewing court in evaluating the veracity of a witness.'" City Council of Orange Twp. v. Edwards, 455 N.J. Super. 261, 272 (App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428 (2015)) (internal quotation marks omitted). "'Only when the trial court's conclusions are so clearly mistaken or wide of the mark' should we interfere to 'ensure that there is not a denial of justice.'" Gnall, 222

N.J. at 428 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)) (internal quotation marks omitted). We review de novo the trial "court's interpretation of the law and the legal consequences that flow from established facts." Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503-04 (App. Div. 2023) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## III.

Applying these well-established principles, we consider plaintiff's arguments. "The purpose of the [UFTA], N.J.S.A. 25:2-20 to -34, is to prevent a debtor from placing his or her property beyond a creditor's reach." Gilchinsky v. Nat'l Westminster Bank N.J., 159 N.J. 463, 475 (1999). "Underlying the [UFTA] is the notion that a debtor cannot deliberately cheat a creditor by removing his property from 'the jaws of execution.'" Ibid. Thus, "[f]raudulent conveyance claims . . . allow the creditor to undo the wrongful transaction so as to bring the property within the ambit of collection." Ibid.

N.J.S.A. 25:2-25 provides:

> a. A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

     (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

     (b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

. . . .

"N.J.S.A. 25:2-26 lists the 'badges of fraud' that New Jersey courts are to consider in determining whether a debtor conveyed property with the actual intent to place it beyond the reach of creditors." Gilchinsky, 159 N.J. at 476.

N.J.S.A. 25:2-27 provides:

a. A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

14

b. A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

. . . .

We conclude the trial court erred in applying the UFTA as to Arlyne because it found "there is no evidence of a creditor seeking to set aside [a] transfer." We have found no case law applying the UFTA in the absence of a creditor. The New Jersey Supreme Court has held "the UFTA's fundamental objective: [is] to protect creditors from transactions that are either intended to defraud them or otherwise deprive them of assets to which they are entitled." Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 327 (2017) (emphasis added); see also Gilchinsky, 159 N.J. at 475 ("The purpose of the [UFTA], N.J.S.A. 25:2-20 to -34, is to prevent a debtor from placing his or her property beyond a creditor's reach.") (Emphasis added). As we have held:

> In determining whether a transfer constitutes a fraudulent conveyance, there are two relevant inquiries. The first is whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them at some point in time but for the conveyance. The second is whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor.

A-1259-24

[Jecker v. Hidden Valley Inc., 422 N.J. Super. 155, 163-64 (App. Div. 2011) (alteration in original) (emphasis added).]

Here, the trial court's application of the UFTA is not supported by the speculative conclusion "that there are creditors which could have instituted the claim to set aside the transfers." Nor is it supported by the court taking judicial notice of a debt owed to a law firm that is not a party in this case and has not sought relief in this case as a creditor.

Additionally, the application of the UFTA to benefit Arlyne would be inequitable here. In applying the UFTA, the trial court found Charles was in debt and the transactions between him, Arlyne and plaintiff were executed to elude creditors. Based on those findings, the court logically must have concluded Arlyne's transfer to plaintiff was fraudulent. Thus, the court voided Arlyne's transfer and restored title to her.[6] However, Arlyne should not be rewarded as a fraudulent transferor.

Based on the court's application of the UFTA here, Arlyne would be permitted to void the transaction with plaintiff—even though she had participated in a fraudulent transfer—and reclaim title to the Property without

---

[6] The logical conclusion of the court's application of the UFTA would have voided Charles's and Arlyne's transaction transferring the Property to Arlyne on January 2, 1998, thus restoring title in them as of that date.

any creditor seeking relief by using the Property to satisfy a debt. Under the doctrine of unclean hands, "[a] suitor in equity must come into court with clean hands and he [or she] must keep them clean after his [or her] entry and throughout the proceedings." Dobco, Inc. v. Bergen Cnty. Improvement Auth., 250 N.J. 396, 400 (2022) (first alteration in original) (quoting Am. Dream at Marlboro, L.L.C. v. Plan. Bd. of Marlboro, 209 N.J. 161, 170 (2012)). "The doctrine of unclean hands . . . [i]n simple parlance, . . . gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit." Faustin v. Lewis, 85 N.J. 507, 511 (1981). Applying the UFTA here would allow Arlyne, a purported fraudulent transferor, to obtain relief—ownership of the Property—despite her unclean hands. That result cannot be countenanced.

IV.

Moreover, the trial court erred in its analysis of the purported mortgages of CCLLGG and GFTA. The trial court concluded the mortgages were unenforceable because: Arlyne was not in title of the Property and, therefore, could not grant a mortgage; the mortgages were not supported by notes; and CCLLGG's and GFTA's status had been revoked by the State.

First, we address the trial court's conclusion that the mortgages on the Property were unenforceable because Arlyne was not in title. A mortgage is "a conveyance of an interest in land." Chem. Bank N.J., N.A. v. City of Absecon, 13 N.J. Tax 1, 8 (Tax 1992); see also N.J.S.A. 25:1-10 ("'Interest in real estate' means any right, title or estate in real estate, and shall include a lease of real estate, a lien on real estate, a profit, an easement, an interest in a trust in real estate and a share in a cooperative apartment."). "The general rule is that a person cannot transfer or mortgage property to which he [or she] has no title." Avon Chair Co. v. Essex Rest. Equip. Corp., 131 N.J. Eq. 448, 449 (Ch. 1942). However,

> [a]n instrument in the form of a mortgage on property which the mortgagor does not own and in which he [or she] has no interest, is considered an executory agreement to give a lien which becomes effective as a mortgage as soon as the property comes into the ownership of the mortgagor. Not until then is the instrument actually a mortgage.
>
> [Id. at 449-50.]

Therefore, the trial court's conclusion that Arlyne could not give CCLLGG and GFTA current mortgages on the Property because she was not in title in 2006 was correct. However, that conclusion alone does not end the analysis regarding CCLLGG's and GFTA's interests because Arlyne could have granted a future

interest, were she to obtain title to the Property. Although we offer no opinion as to the trial court's ultimate determination regarding the chain of ownership of the Property, we add the trial court must consider whether Arlyne created an interest if it concludes she was not in title on the date of valid mortgages.[7]

Next, we consider the trial court's decision that there were no enforceable mortgages because there were no notes. "A mortgage secures a debt; 'without an obligation to secure there can be no valid mortgage.'" Gotlib v. Gotlib, 399 N.J. Super. 295, 312 (App. Div. 2008) (quoting Mardirossian v. Wilder, 76 N.J. Super. 37, 41 (Ch. Div. 1962)). "The debt may be evidenced by a separate writing, such as a bond or a note; however, such a document is not legally required." Ibid. Thus, as a matter of law, the absence of a note may not be fatal to CCLLGG and GFTA claims. Instead, the trial court must consider whether there was an enforceable debt or obligation. Obviously, "without a subsisting debt or obligation, the mortgage has no efficacy. . . . [W]hen the underlying obligation fails, the mortgage becomes a nullity." Great Falls Bank v. Pardo,

---

[7] For example, we note the trial court's application of the UFTA voided Arlyne's transfer to plaintiff in October 2004. Although we conclude the court erred in applying the UFTA as to Arlyne, the result of the trial court's decision actually vested Arlyne with title in March 2002. Thus, she would have been in title in 2006, when the mortgages were granted.

263 N.J. Super. 388, 397 (Ch. Div. 1993), aff'd, 273 N.J. Super. 542 (App. Div. 1994).

We are aware, under certain circumstances, N.J.S.A. 25:1-5(f) requires a "writing" "signed by the party to be charged therewith" when there is:

> A contract, promise, undertaking or commitment to loan money or to grant, extend or renew credit, in an amount greater than $100,000, not primarily for personal, family or household purposes, made by a person engaged in the business of lending or arranging for the lending of money or extending credit.

However, given the scant factual findings by the trial court, we cannot determine whether the statute applies to this matter. For instance, we cannot discern whether funds actually were loaned to Arlyne, the "purpose" of any such loan, and in what business CCLLGG and GFTA were engaged.

Moreover, and again on the scant factual findings, we are unable to determine the applicability in this case of our "well settled [law] that an oral contract or agreement which might otherwise be barred by the Statute of Frauds is enforceable where there has been performance by one party and to do otherwise would work an inequity on the party who has performed." Graziano v. Grant, 326 N.J. Super. 328, 341 (App. Div. 1999) (citing Klockner v. Green, 54 N.J. 230, 236 (1969)). "The Statute of Frauds is designed to prevent fraud" and "cannot be invoked to work an injustice." Ibid. (citing Klockner, 54 N.J. at

20

236).  Thus, if there was performance, i.e. the loan of money, Arlyne may be bound despite the lack of writing, if a writing was even required.

Lastly, we consider the effect that CCLLGG's and GFTA's revoked status had on the ability to reinstate or pursue enforcement of the mortgages.  Pursuant to N.J.S.A. 43:2C-53(d)[8]:

> A limited liability company that has been placed on the inactive list continues in existence but, . . . may carry on only activities necessary to wind up its activities and liquidate its assets.

Therefore, if the enforcement of the mortgages or collection of the loan was part of the "wind up of its activities" of CCLLGG and GFTA, their inactive or revoked status would not, alone, have precluded them from pursuing these "activities."  "'Winding up' consists of settling company debts, closing its activities, distributing any assets, and participating in any litigation."  Patel v. N.J. Dep't of Treasury, Div. of Rev. and Enter. Servs., 479 N.J. Super. 26, 34 (App. Div. 2024); see also Lancelotti v. Maryland Cas. Co., 260 N.J. Super. 579, 583 (App. Div. 1992) ("A dissolved corporation exists solely to prosecute and defend suits, and not for the purpose of continuing the business for which it was

---

[8] Because the complaint was filed after March 1, 2014, the applicable statute is the Revised Uniform Limited Liability Company Act (RULLCA), N.J.S.A. 42:2C-1 to -94.

established."); N.J.S.A. 42:2C-54(c) ("When a reinstatement becomes effective, it relates back to and takes effect as of the effective date of the filing office action placing the company on the inactive list, and the limited liability company may resume its activities as if the filing office action had not occurred."). On remand, the trial court must consider whether CCLLGG's and GFTA's actions were part of a "winding up."

Because the trial court erred in its analysis of the validity of the CCLLGG and GFTA mortgages, we vacate the part of the judgment deeming those mortgages invalid and unenforceable and remand with instructions the court consider the validity of those mortgages consistent with this opinion. We take no position on the ultimate outcome.

V.

Because we conclude the court erroneously applied the UFTA as to Arlyne, we similarly conclude the court erred in voiding Arlyne's October 29, 2004 deed of the Property to plaintiff. On remand, the court shall restore title to the Property as it existed at the time of trial. After further proceedings, the court can ultimately determine the correct party in title.

In addition, the court erred in its incomplete analysis regarding whether CCLLGG or GFTA were mortgagees or held interests. On remand, it must

22

thoroughly consider these issues. If it determines CCLLGG or GFTA were mortgagees or held interests, it must conduct a UFTA analysis concerning their status as potential creditors who had filed this lawsuit and whether Charles's and Arlyne's transactions violated UFTA.

In addition, we note the parties pled various causes of action against one another. However, because the trial court erred in its analysis, it also omitted a review of the other causes pled. Thus, on remand the court must consider all the parties' allegations not otherwise resolved or not previously dismissed.

Vacated and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-1259-24